**PENN YAN BOATS, INC., Plaintiff,**

v.

**SEA LARK BOATS, INC., et al.,
Defendants.**

Civ. A. No. 71-5-CIV.

United States District Court,
S. D. Florida.

May 19, 1972.

James M. Wetzel, Wetzel, Greenwalt & Fitzgibbon, Chicago, Ill., and Richard S. Banick, Fowler, White, Humkey, Burnett, Hurley & Banick, Miami, Fla., for plaintiff, Penn Yan Boats, Inc.

Alfred B. Engelberg, Amster & Rothstein, New York City, and Irwin J. Weiner, Weiner & Rubin, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEHRTENS, District Judge.

### I. Nature of the Controversy

1. This is an action for patent infringement, trademark infringement, unfair competition and trademark dilution brought by Penn Yan Boats, Inc. (hereinafter referred to as "Penn Yan" or

"plaintiff"), against defendants, Sea Lark Boats, Inc., Don's Marine Center, Inc., and Donald L. Wollard (hereinafter collectively referred to as "Wollard" or "defendants"). Wollard has answered and counterclaimed against Penn Yan for patent infringement (Pre-trial Stipulation, par. 1)*.

2. This action arises under the Patent and Trademark Laws of the United States (35 U.S.C. Secs. 281–283, 15 U.S. C. Sec. 1125(a)) and the laws of the State of Florida. The subject matter in controversy exceeds the sum of $10,-000.00 exclusive of interest and costs, and the Court has jurisdiction under 28 U.S.C. § 1338 and 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1400 (Pre-trial Stip., par. 2).

3. Plaintiff is the owner by assignment of United States Letters Patent No. 3,515,087 entitled "PLANING BOAT" issued in the name of Robert B. Stuart, plaintiff's president, on June 2, 1970, based upon an application filed September 20, 1968, which application was. a continuation-in-part of earlier filed Application Serial No. 722,320, April 18, 1968 (Pre-trial Stip., par. 5A).

4. The individual defendant, Donald Wollard, is the inventor and owner of United States Letters Patent No. 3,469,-557 entitled "CHANNEL STERN POWERED BOAT" issued in the name of Donald L. Wollard on September 30, 1969, based on an application filed on May 1, 1967 (Pre-trial Stip., par. 5C).

### II. The Inventive Concept and Its Development

5. Both plaintiff and defendant Wollard are the owners of Patents covering high speed boats designed for shallow draft operation. The boats of the respective patents each include a hull having a tunnel in its bottom which extends from about the middle of the boat to an opening in the transom of the boat. The

* Throughout these Findings, the pages of the record will be referred to by the letter "R" followed by the pertinent pages of the record; Plaintiff's Exhibits will be referred to as "PX" followed by the Exhibit number; Defendants' Exhibits will be referred to by the letters "DX" followed by the Exhibit number.

tunnels of the respective patents are designed and arranged so that a full flow of unaerated water passes through such tunnels when the boats are in motion. This permits the propellers to be raised from their normal locations below the bottoms of the respective hulls to a point which is in substantial axial alignment with the flow of water through the tunnels while still maintaining efficient propulsion. The Wollard patent stresses a preferred outboard or stern drive embodiment of this tunnel propulsion concept in which the propeller is behind the tunnel. The Stuart patent stresses an inboard embodiment of this tunnel propulsion concept in which the propeller is in the tunnel and the hull has the popular deep-V configuration (PX 1, 28, 29, 43; R 33, 111, 112, 203, 372–377).

6. The parties are in apparent agreement that a patentable invention exists. Their apparent disagreement focuses on which of the parties was the first to make the tunnel propulsion invention and on the scope of the respective patents in suit. The facts relating to the development of tunnel propulsion boats by the respective parties is significant to a proper analysis and understanding of their conflicting claims (Pre-trial Stipulation; R 5–27).

7. On January 1, 1966, defendant Wollard, who is the president of co-defendants Sea Lark and Don's Marine Center, conceived the idea of incorporating a tunnel into the after bottom portion of a boat hull for the purpose of enhancing the shallow water capability of the boat without adversely affecting its high speed running characteristics. According to Wollard's conception drawing and notes, the tunnel was designed to extend through the transom and would permit the drive or propeller to be located at a point substantially higher than in conventional boats, which lack the tunnel, while still obtaining efficient propulsion. Wollard contemplated that the design could be incorporated in a variety of hull shapes, including a deep-V hull shape and that it would function with

outboard, inboard-outboard or inboard power (DX 1; R 305).

8. In order to test his tunnel propulsion concept, defendant Wollard constructed a plywood boat having a flat bottom which included a tunnel commencing at approximately the middle of the boat and continuing through an opening in the transom at the stern. This boat was powered with an inboard engine and a substantial portion of the propeller was located within the tunnel and above the bottom of the boat. The top of the tunnel in the plywood boat extended rearwardly from the transom at the stern of the boat and acted both as a continuation of the top of the tunnel and as a bracket to hold a rudder. The plywood boat was constructed and tested by Wollard prior to June, 1966, and although it was a purely experimental boat which was later destroyed, it was a successful test of the tunnel propulsion concept (DX 2; R 307–309; Pre-trial Stip., par. 5E).

9. Commencing in June, 1966, Wollard began work on the construction of a mold for a fiberglass boat which would incorporate the tunnel structure of his plywood boat. A conventional shallow-V, 19 foot, fiberglass hull was used as a plug for the basic shape of the new mold; and the plug was modified so as to include the described tunnel structure. The first boat manufactured from this mold was completed in November, 1966, and was known as the Sea Lark 2000 (R 310; Pre-trial Stip., par. 5F).

10. The first Sea Lark 2000 was powered with a used 125 horsepower Chrysler inboard engine. This boat was originally owned by defendant Sea Lark, but on November 17, 1966, shortly after construction was completed, the boat was sold to defendant Don's Marine Center so that financing could be obtained. The inboard Sea Lark 2000 was used as a demonstration model for sales promotion during late 1966 and the early part of 1967. It ran well in shallow water as well as at high speeds. In March, 1967, the inboard Sea Lark 2000 was sold to

a customer from Michigan (DX 9, 10, 11; R 311–318; Pre-trial Stip., par. 5F).

11. The inboard Sea Lark 2000 had the following structural features:

(a) A shallow-V planing hull in which the bottom side portions of the hull on opposite sides of the keel line were approximately 5° above a horizontal line at the stern;

(b) A tunnel in the bottom of the hull;

(c) The tunnel beginning at approximately mid-ships of the hull and extending aft to an opening in the stern of the hull;

(d) A propeller arranged for revolving in the tunnel forward of the stern of the hull;

(e) The propeller being nearly the diameter of the tunnel and being located substantially above the keel line of the hull;

(f) A rudder extending down approximately to the bottom of the propeller; and

(g) A spray plate secured to the stern of the hull over the tunnel and extending aft over the rudder (PX 15, 20, 33, 34; R 303–305, 393–396; Pre-trial Stip., par. 5F).

12. Shortly after the construction of the first Sea Lark 2000 with the Chrysler inboard engine, a second Sea Lark 2000 was produced by Wollard from the same mold. The second boat was powered with an outboard engine and was also used for sales promotion purposes, including exhibition at the Miami Boat Show in January, 1967 (DX 15; R 315–322; Pre-trial Stip., par. 5F).

13. Commencing in late 1966, Wollard and his companies began actively selling and promoting the sale of the Sea Lark 2000. All of these boats were produced from the original mold which was constructed in the Summer and Fall of 1966. During the initial period of sales activity, Wollard's emphasis was on the outboard and stern drive powered boats, since such types of power were the most commercially acceptable at that time

(DX 20A, B; PX 42, 81–91; R 318–322, 377, 589, 590).

14. By March 1967, Wollard had completed the construction of another inboard-powered tunnel boat. This boat was similar to the Sea Lark 2000, with the exception that it was 22 feet long and was a deep-V hull having 30° of deadrise at the stern, i. e. the bottom side portions of the boat were at an angle of 30° with a horizontal line drawn through the keel. Defendant Wollard used this boat as his personal fishing boat for more than a year. Although the initial boat was operative, Wollard was dissatisfied because of the high engine speed required to make the boat plane. In order to improve its performance, Wollard ultimately modified the hull bottom so that it included a flat section over most of its length which improved the boat's planing performance and stability. In 1969, the modified boat was used as a plug to construct a mold for the boats which came to be known as the Sea Lark 2250 and 2300 (PX 92; R 327–333, 353–358, 590, 591; Pre-trial Stip., par. 5G).

15. There is no dispute between the parties as to the essential facts summarized in Findings 7 to 14. Plaintiff has stipulated as to the basic structure of the inboard and outboard boats built by Wollard and the dates on which they were built. Wollard's concept of the purpose and function of the tunnel, including its ability to be used with a variety of hull shapes and power means, is amply corroborated in correspondence between Wollard and his patent attorney from October, 1966 to May 1, 1967, when the Wollard patent application was filed (DX 3, 5, 7, 8, 13; R 323–327).

16. The development of the Penn Yan tunnel boat which is the subject of the Stuart patent in suit, did not commence until sometime in early 1967, well after Wollard had completed and tested both the inboard and outboard versions of the Sea Lark 2000 and had begun to advertise that boat. The initial drawings establishing Stuart's conception of a tunnel boat were not completed by Stuart until

sometime in February, 1967 (PX 1, 7, 8; R 61–68).

17. The first experimental boat built by Stuart to test his design concept was not completed until the middle of May, 1967, after the May 1, 1967 filing date of the Wollard patent application. The boat was a 23 foot fiberglass boat and included the following structural features:

(a) A deep-V planing hull in which the bottom side portions of the hull on opposite sides of the keel line were approximately 18° above a horizontal line at the stern;

(b) A tunnel in the bottom of the hull;

(c) The tunnel beginning at approximately mid-ships of the hull and extending aft to an opening in the stern of the hull;

(d) A propeller arranged for revolving in the tunnel forward of the stern of the hull;

(e) The propeller being nearly the diameter of the tunnel and being located substantially above the keel line of the hull;

(f) A rudder extending down approximately to the bottom of the propeller; and

(g) A spray plate secured to the stern of the hull over the tunnel and extending aft over the rudder.

The tunnel boat constructed and tested by Stuart in mid-May, 1967, is the only boat with which Stuart experimented prior to the filing of his initial patent application on April 18, 1968 (PX 7–10; R 72–76, 136, 176–178).

■ 18. On the basis of the above facts, it is clear that Wollard was the first inventor of the tunnel propulsion concept. He was the first to conceive this idea or concept, the first to successfully reduce this concept to practice both in shallow- and deep-V boats with either inboard or outboard power; and the first to file a patent application in the United States Patent Office covering the tunnel propulsion concept and structure (Findings 7–17, supra).

### III. The Wollard Patent Is Infringed

■ 19. Defendants contends that the tunnel boats manufactured by plaintiff Penn Yan infringe claims 18, 19 and 20 of the Wollard patent in suit. Claim 18 is representative and reads as follows (the claim being broken into subparagraphs for convenience):

A powered boat for high speed shallow draft operation comprising in combination:

(a) Hull means including a bottom provided with a fore foot portion and a transom;

(b) A channel in said bottom and extending from a tunnel entrance rearwardly of said fore foot portion to a rear channel opening in said transom;

(c) Power means on said hull means and comprising a propeller shaft above said bottom and including an axis of rotation substantially aligned with the longitudinal axis of said channel;

(d) A propeller on said shaft;

(e) And means forming a rearward continuation of the top of said channel;

(f) Said channel being relatively narrow with respect to the bottom whereby substantially all of the flow is delivered to the propeller.

20. A comparison of claim 18 of the Wollard patent with the boats being sold by Penn Yan reveals that there is literal infringement of the Wollard claims. For convenience, the comparison can be made with the detailed description set forth in the Stuart patent, since that patent admittedly describes the boat actually being sold by Penn Yan. The comparison was also made during the trial with a model of a Penn Yan boat and photographs of the boat. As to the preamble of claim 18 of the Wollard patent, the Penn Yan boat is quite obviously a power boat designed for high speed, shallow draft operation (Stuart patent, Col. 1,

line 61). The Penn Yan boat also includes the following structural features:

(a) A hull 10 including a bow or fore foot portion 12, a bottom 14 and 15 and a transom 13 (Stuart patent, Fig. 2, Col. 3, lines 1–11);

(b) A tunnel 16 in the hull bottom which extends from an entrance located aft of the bow or fore foot portion to an opening in the transom (Stuart patent, Fig. 4, Col. 3, lines 31–37);

(c) Power means, including a propeller shaft 18 which is above the bottom and has an axis of rotation which is substantially aligned with the longitudinal axis of the channel (Stuart patent, Figs. 2 and 4, Col. 3, lines 38–44);

(d) A propeller on the shaft (Stuart patent, Figs. 1–5, Col. 3, lines 46–52);

(e) A spray plate 24 which forms a rearward continuation of the top of the tunnel aft of the stern (Stuart patent, Fig. 5, Col. 6, lines 1–5); and

(f) The tunnel is relatively narrow with respect to the bottom so that substantially all of the flow through the tunnel is delivered to the propeller (Stuart patent, Figs. 2 and 4, Col. 1, lines 46–59).

21. Despite the literal infringement of the Wollard patent claims, plaintiff insists that the claims 18 to 20 of the Wollard patent must be narrowly and non-literally construed so that they read only on a tunnel boat powered by an outboard or stern drive engine in which the propeller is located behind the tunnel rather than in the tunnel. Plaintiff's argument for a narrow interpretation of the scope of the Wollard patent is based upon the allegation that Wollard had not invented a successful inboard version of the tunnel boat prior to the filing of his patent application; that the Wollard patent applications, as originally filed, did not contain a description of the invention which was sufficient to permit Wollard to make or obtain claims which would be broad enough to cover an inboard tunnel boat with a propeller located in the tunnel; and that claims broad enough to cover an inboard embodiment were improperly added to the Wollard application almost two years after the Wollard application was originally filed in an attempt to misappropriate plaintiff's invention. The Court has examined the facts related to these allegations and concludes that they are not supported by the evidence and do not warrant a non-literal construction of the Wollard patent claims (Pre-trial Stip., pp. 6–8).

22. Plaintiff has stipulated that an inboard version of the Sea Lark 2000 was constructed and sold prior to the filing date of the Wollard patent application and prior to the reduction to practice of the alleged Stuart invention (Finding 10, supra). Plaintiff has also stipulated to the construction of a deep-V inboard tunnel boat by Wollard in March, 1967 (Finding 14, supra). The evidence establishes that the first Sea Lark 2000 was structurally identical to later inboard Sea Lark 2000's and that this boat performs satisfactorily. There is no evidence to establish that either the original inboard Sea Lark 2000 or the deep-V inboard, both designed and constructed by Wollard, were unsuccessful or abandoned experiments. Under the circumstances, plaintiff's assertion that Wollard did not fully possess an inboard tunnel propulsion concept and structure until after reading a July, 1968 "Popular Mechanics" article describing the Penn Yan boat is totally unsupported by the evidence. Moreover, any suggestion that Wollard was and is dishonestly attempting to broaden his patent claims to claim an invention which he did not, in good faith, believe to be his own invention is unwarranted. There is nothing inherently wrong or dishonest in amending claims in a pending application during the course of prosecution before the United States Patent Office in order to insure that the claims which ultimately appear in the issued patent will cover the commercial activity of third parties, whose potentially infringing activities are discovered subsequent to the filing of a patent application, so long as the claims are supported by

the original patent application disclosure. Thus, whether or not Wollard was spurred into making broader claims in his then pending application by the appearance of the Penn Yan publication is irrelevant; and the only legitimate issue of fact or law is whether claims 18 to 20 of the Wollard patent are supported by the original disclosure of the Wollard application as filed on May 1, 1967 (PX 34, 62, 63, 64; R 253, 354, 317, 393, 571–573).

23. Although the Wollard patent in suit does not use the word "inboard" or a specific phrase which states that the propeller may be located in the tunnel, there is no doubt that claims 18 to 20 of the Wollard patent are literally supported by the original Wollard specification as filed on May 1, 1967, without regard to any amendments which were made to the specification thereafter. Plaintiff stipulated to the correctness of that assertion during the course of trial. Moreover, a comparison of claims 18 to 20 with the original Wollard specification reveals that those claims are generic to both inboard and outboard embodiments and are, therefore, clearly supported by the general description of the invention as well as the preferred outboard embodiment (PX 28; R 521–528, 543, 601).

24. The conclusion that claims 18, 19 and 20 of the Wollard patent are supported by the original Wollard disclosure also is supported by the prosecution history which led to the allowance of the Wollard patent. The patent statutes (35 U.S.C. § 132) specifically prohibit the introduction of new matter into a patent application by way of amendment to the specification or claims. It is the duty of the Examiner in the United States Patent Office, in the first instance, to reject amendments to the specification or claims which are improper and not encompassed within the scope of the original disclosure. No such rejection appears in the Wollard file history; and it is, therefore, clear that the Examiner did not consider claims 18, 19 and 20 to encompass new matter. Plain-

tiff's contention that the Patent Examiner did not consider the questions since he was not told that the claims were being broadened cannot be seriously considered. The claims were submitted to the Patent Examiner for his review; and, in the absence of any evidence to the contrary, it must be presumed that he read and understood each and every claim in the application and appreciated their scope. In this connection, it is noteworthy that plaintiff's interrogatories submitted to the United States Patent Office for answer by the Patent Examiner fail to lend any support to plaintiff's allegation that there was not a full disclosure by Wollard to the Patent Office (PX 28; R 649–651).

25. In view of the foregoing evidence, including plaintiff's own admission that there is literal support for claims 18 to 20 of the Wollard patent in the original Wollard application, it appears that the issue which plaintiff seeks to raise has nothing to do with the so-called doctrine of "late claiming" or "intervening rights" but rather boils down to a question of claim construction, i. e. whether the issued patent claims should be read in their normal or natural sense or whether they should be more narrowly construed in the light of the specification and file history of the Wollard application resulting in the Wollard patent. Wholly apart from the questions of law raised by the question of claim construction, the Court finds that a literal interpretation of the claims is justified by the scope of the invention described in the original Wollard patent application (Findings 26–28, infra).

26. The essence of the tunnel. propulsion invention described in the original Wollard patent application is a combination of structural elements which enables a power boat to be operated efficiently at high speeds in normal operations as well as in shallow water. The key factor in achieving that result resides in devising a propulsion means enabling the propeller, which is conventionally located below the bottom or keel of a boat, to be moved to a position above

the keel while still functioning as an efficient propulsion system. Since propellers are sensitive and are subject to ventilation and cavitation, it would normally be expected that if the propeller was elevated from its conventional position, serious problems of cavitation, ventilation or. turbulence would be encountered which would render the propulsion system inoperative or so inefficient as to be practically inoperative. The Wollard invention overcomes this problem by providing a tunnel in the bottom of the boat hull which commences at a point aft of the fore foot portion of the boat and below the waterline and which extends rearwardly to an opening in the transom. This arrangement provides for a high density flow of water through the tunnel to a propeller which is aligned with the tunnel (Original Wollard specification page 12, lines 14–22). A full flow of water to the propeller is further insured by maintaining a close tolerance between the diameter of the tunnel and the diameter of the propeller (Original Wollard specification page 14, lines 8–20). Finally, the flow of water from the tunnel is further controlled by a cavitation plate which is positioned so as to form a rearward continuation of the top of the tunnel behind the transom of the boat (Original Wollard specification, page 15, lines 1–10). In the preferred outboard embodiment described in the Wollard specification, the plate forming the rearward continuation of the top of the tunnel is the cavitation plate of an outboard engine. However, it is clear from the Wollard specification that the outboard engine is positioned in such a fashion that the cavitation plate not only serves its normal function on such an outboard engine, but also functions as a rearward continuation of the top of the tunnel in order to insure a full flow of water to a propeller located behind the transom. It is the ability to deliver a full flow of water to a propeller located above the bottom of the boat which is the key to the Wollard invention and the feature which distinguishes the boat from conventional boats and provides the shallow water capability (PX 28; R 372–377, 541, 655–657).

27. Although the Wollard patent describes the invention in terms of preferred outboard and outdrive embodiments, it is evident from the description contained in the original Wollard application as filed, that the essence of the invention is the delivery of a full flow of water of suitable quality through a tunnel to a propeller which is aligned with the flow of water in the tunnel. It would readily occur to a person of ordinary skill in the art, that if a full flow of water could be delivered to an outboard propeller located behind the tunnel, there must be a full flow of water in the tunnel and an inboard propeller would function equally well if located within the tunnel (R 376–377, 657).

28. There is nothing in the original Wollard specification which would indicate that the invention concept could not be employed with an inboard engine; and generally there is no legal requirement that every embodiment of the invention be specifically disclosed in a patent application. Furthermore, a review of the Wollard file history does not reveal the existence of any file wrapper estoppel which would require that Wollard patent claims 18 to 20 should be given a more narrow construction because of amendments made to secure the allowance of these claims. The Court therefore finds that there is no reason to give claims 18 to 20 an interpretation other than their clear and unambiguous meaning. When so construed, claims 18 and 20 are infringed by the Penn Yan tunnel boats.

*IV. The Wollard Patent is Valid*

29. Although the Pre-trial Stipulation indicated that plaintiff would contest the validity of the Wollard patent in view of 16 identified prior art publications and patents, the evidence introduced at trial was limited to but a single prior art publication, an unpublished sketch and a claim that Wollard's own Sea Lark 2000 is a prior public use which invalidates the Wollard patent. It is ap-

propriate to presume that the collection of prior art cited in advance of trial by plaintiff was repetitive and that plaintiff selected what it considered to be the best of the cited prior art for presentation to the Court (Pre-trial Stip., par. 7C; R 604–613).

30. Plaintiff contends that an article entitled *"Sandpiper, a Twenty-Two Foot Shoal Draft Runabout"* which appeared in a series entitled *"How to Build Thirty-Five Modern Motor Boats"* published by *Motor Boating* in 1929 fully anticipates claims 18, 19 and 20 of the Wollard patent. Despite the allegation of full anticipation in this article, cross-examination of plaintiff's expert witness revealed that the illustrated Sandpiper, although including a tunnel which extends through the stern or transom of the boat, does not include a propeller shaft located above the bottom of the boat; does not include a propeller shaft having an axis of rotation substantially aligned with the tunnel; does not have a propeller located above the bottom of the boat; does not disclose means forming a rearward continuation of the top of the tunnel beyond the transom; does not disclose or suggest that the size of the propeller must be nearly the diameter of the tunnel so that substantially all of the flow through the tunnel would be delivered to the propeller. In short, Sandpiper does not include the structural limitations set forth in claims 18 to 20 of the Wollard patent, nor does this article disclose or suggest a structure which would function in the same manner as taught in the Wollard patent to achieve the same result. The Sandpiper article simply does not support plaintiff's assertion that the Wollard patent is anticipated, and there is no teaching in this article itself, nor any testimony in the Record on which to base a finding that the structural differences between the tunnel propulsion means taught by the Wollard patent and the Sandpiper article would have been obvious to a person of ordinary skill in the art at the time the Wollard invention was made (PX 44H; R 619–635, 651–654).

31. The sketch which is relied on by plaintiff as a full anticipation of Wollard patent claims 18, 19 and 20 was drawn by Edward Weigl, the designer of the "Big C" during the taking of his deposition in New Bern, North Carolina, on July 26, 1971. According to Weigl's testimony, the sketch is representative of an experimental boat which was allegedly built at an undefined time "about 15 or 16 years" ago. There are no photographs or documentary evidence from which the actual structure of this boat or the date on which it was built can be ascertained so that a meaningful comparison could be made with claims 18 to 20 of the Wollard patent. Weigl's testimony with regard to this boat does not indicate where the tunnel started; is uncertain as to the location of the axis rotation of the propeller shaft and propeller; does not indicate that the boat included a rearward continuation of the top of the tunnel; does not indicate that the boat was so designed that substantially all of the flow was delivered to the propeller. In short, there is insufficient evidence in the record to establish that the Weigl boat is proper prior art and, even if it were, to establish that it included structural components which would anticipate the Wollard claims in suit or render them obvious to a person of ordinary skill in the art. The testimony of plaintiff's expert on this sketch is meaningless since he admittedly never saw the boat alleged to have been built in accordance with the sketch and had absolutely no information on which to base his opinion as to the boat's construction and performance except for Weigl's incomplete testimony (PX 106; DX 55, pp. 58–60; R 610, 618, 619).

32. Plaintiff claims that the Sea Lark 2000 is a prior public use and sale of the Wollard invention more than one year before the invention was claimed by Wollard, and, therefore, invalidates claims 18 to 20 of the Wollard patent (35 U.S.C. § 102(b)). Prior findings establish that the inboard Sea Lark 2000 was completed in November, 1966, and sold in March, 1967, and that the application

which resulted in the Wollard patent was filed on May 1, 1967. The assertion that the Sea Lark 2000 is a prior public use and sale is based upon plaintiff's "late claiming" theory. According to that theory, Wollard is allegedly not entitled to his original filing date for claims 18 to 20 because these claims were not supported by the original disclosure. The Court has already found that these claims were supported by the original disclosure of the Wollard patent application (Findings 23–28) and accordingly the Sea Lark 2000 is not prior art as against Wollard's own patent (R 613–617).

## V. The Stuart Patent Is Invalid

33. The Stuart patent in suit is directed to a tunnel propulsion concept which is substantially identical to that previously disclosed in the earlier Wollard patent and invented by defendant Wollard. The Stuart patent describes a structural arrangement which permits a propeller to be raised from its normal position below the bottom of a boat so that it is substantially above the keel line of the boat. This is accomplished by providing a tunnel which begins at approximately mid-ships and below the waterline and extends through an opening in the transom. The arrangement permits a full flow of water to be delivered through the tunnel; and the propeller is located within this full flow. The size of the propeller is selected so that it is close to the size of the tunnel in order to insure that the full flow of water from the tunnel reaches the propeller. Finally, Stuart provides a plate which is located above the top of the tunnel opening at the transom and acts as a rearward continuation of the tunnel, thereby insuring that the flow of water from the tunnel continues aft of the transom. The Stuart patent stresses as one feature the use of an inboard engine with a propeller located in the tunnel and as another feature the combination of the tunnel arrangement with a deep-V hull form. For reasons which will be explained hereinafter, it is clear that neither of these features is essential to the basic tunnel propulsion concept and cannot form the basis for a claim that the Stuart patent defines a patentable invention over the Wollard invention and the Wollard patent (Finding 20, supra; PX 1, 2, 18; R 374, 375, 530–537).

34. A substantial portion of the trial dealt with plaintiff's assertion that the combination of the tunnel with a deep-V hull and a propeller located in the tunnel, i. e., an inboard power means, is an invention because this combination results in a so-called "reaction drive." According to plaintiff's "reaction drive" theory, the movement of a deep-V hull through the water at planing speeds, creates a void or depression behind the moving boat. In this condition, it is asserted that the propeller which is located in the tunnel of the hull acts as a pump and water is pumped through the tunnel and discharged into the void behind the boat, at an accelerated rate, thereby producing a reaction or thrust to propel the boat. Further, according to plaintiff's theory, the "reaction drive" which occurs is similar to the effect achieved with a jet drive boat, but the tunnel boat is superior since it is mechanically simpler and cheaper to construct. Plaintiff also asserts that the deep-V hull is critical to the "reaction drive" operation because the deeper angle of such boats causes the boats to ride deeper in the water thereby insuring that the tunnel remains below the operating waterline so that a full flow of water is delivered to the propeller (PX 16; R 197–205).

35. Defendants disagree with plaintiff's "reaction drive" theory. According to defendants, the so-called depression or void behind the boat is nothing more than the normal wake which is associated with all planing boats. The shape of this wake is determined by the shape of the transom or stern of the boat. Thus, if the tunnel did not extend through an opening at the transom, the shape of the depression, like the shape of the transom, would be a full V which would be shallow or deep depending solely upon the shape of the hull at the stern of the boat. When the tunnel is added,

the shape of the wake changes so that it conforms to the new shape of the transom which now looks like a modified V due to the hole caused by the tunnel opening. The propeller which is located in the tunnel merely functions to accelerate the water which is already present because of the hull shape. Since there is water behind the tunnel as well as in the tunnel at all times, there is no discharge into a void. Under defendants' theory of operation, the shallowness or deepness of the V hull is not significant to the operating characteristics of the boat save for the conventional effects which such known differences in hull shape are known to cause (DX 64; R 366–372, 378–381).

36. While the disagreement between the experts as to the technical reasons for the successful operation of boats incorporating this new tunnel propulsion system are interesting, there are several reasons why they are irrelevant to a determination of whether or not claims 1, 10 and 15 of the Stuart patent define a patentable invention. Therefore, it is unnecessary to determine which, if either, of the theories of operation is correct. First, the Stuart patent states (Col. 4, line 28) that "The invention is not limited to any particular theory of operation." Second, it is evident from an examination of the claims that only structural limitations are recited, and there is nothing which expressly or impliedly limits the claims to a particular theory of operation. Claim 1 of the Stuart patent, stripped of excess language, defines the alleged Stuart invention as follows:

(a) A deep-V planing hull,

(b) Formed to define a water tunnel,

(c) Lying below the operating waterline of the hull, and

(d) Open at the stern,

(e) With a propeller nearly the diameter of the tunnel,

(f) Arranged above the keel line of the hull,

(g) To revolve in the tunnel forward of the stern end, and

(h) A rudder positioned near the stern end of the tunnel.

Claims 10 and 15 are each dependent on claim 1. Claim 10 adds the requirement that a spray plate be attached to the stern of the hull and that the plate extend closely over the rudder. Claim 15 limits the structure to a single tunnel located at the center of the hull (PX 1; Plaintiff's Pre-trial Brief, p. 3; R 33, 182).

37. The Sea Lark 2000 powered with a Chrysler inboard engine which was constructed by Wollard in November of 1966, and sold in March of 1967 (Finding 10, supra) is prior art with respect to the Stuart patent since that boat was in public use and on sale in the United States for more than one year prior to the filing of the Stuart patent application on April 18, 1968. The Sea Lark 2000 includes each and every structural feature set forth in claims 1, 10 and 15 of the Stuart patent, with the exception that the Sea Lark boat is a shallow-V planing hull in which the bottom side portions of the hull at the stern of the boat are at a 5° angle with a horizontal line drawn through the keel (See Findings 11 and 36, supra). The Stuart patent defines a "deep-V planing hull" as a hull in which the bottom side portions of the hull are at an angle of 8° to 25° with a horizontal line drawn through the keel (Stuart patent, Col. 3, lines 1–11). Thus, in the first instance, plaintiff's argument that the Stuart patent defines a patentable invention over the Sea Lark 2000 is predicated on a 3° difference in the angle of the hull (PX 1, 34; R 255, 304, 305, 394–396; Pre-trial Stip., par. 5F).

38. The characteristics of both shallow and deep-V hulls without tunnels were well known in the art long prior to the earliest date for the alleged Stuart invention. The deep-V hull, due to its shape, has a deeper draft, tends to run lower in the water and is generally considered to be a better rough water boat because the deep-V shape reduces pounding in rough seas. Shallow-V boats tend to ride higher in the water, but at a flat-

ter trim angle due to the greater amount of planing surface. The testimony with respect to the inter partes tests conducted prior to trial and the other experiences of the witnesses in the operation of the respective boats confirms that both the shallow-V and deep-V tunnel boats are operative under a variety of sea conditions. (R 233, 234, 253–255, 378–381, 392–394, 433).

39. Even if the claims of the Stuart patent are limited to a particular theory of operation, the theory would be irrelevant to a comparison of the claims of the Stuart patent with the inboard Sea Lark 2000. Both Stuart and plaintiff's expert witness acknowledge that the shallow-V Sea Lark 2000 would operate on the same "reaction drive" principle as the deep-V boat set forth in the Stuart claims if that principle is correct (R 150–152, 174, 253–255).

40. The history of the development work which led to the filing of the Stuart application also establishes that the deep-V hull is not critical to the performance of the Penn Yan tunnel boat. Stuart acknowledges that all of his experimental work was conducted with a single boat having an 18° deep-V hull. No experimental work was done prior to the filing of the Stuart application which lends support to the alleged criticality. Moreover, correspondence between Stuart and his patent attorney reveals that the initial disclosure summarized in counsel's letter of July 19, 1967, did not even indicate any criticality for a deep-V hull. It was only after a study of the prior art was completed that the deep-V hull was first emphasized. This fact is made clear by a letter of January 5, 1968, from plaintiff's patent counsel to the Washington search associate which states as follows:

"In reviewing the previous tunnel hulled patents and discussing the matter with our client, we have come to believe that the propeller tunnel is especially important to a 'deep vee' hull. Such a hull is prized for its good riding characteristics and has a vee bottom the halves of which are angled up at least 8° from the horizontal."

Admittedly, the riding characteristics of the deep-V hull were well known in the art prior to the Stuart invention and cannot form a basis for patentability of the claims of the Stuart patent which are essentially directed to a tunnel propulsion system (DX 41B, D; R 136).

41. In summary, the deep-V hull is clearly not critical to the operation of a boat having the tunnel structure and propulsion system set forth in the Stuart patent. Both the Sea Lark 2000 and the Stuart boat include essentially the same structure and function in essentially the same manner, irrespective of the theory used to explain that function, and they both achieve the same result. It would be obvious to a person of ordinary skill in the art to substitute the well known and popular deep-V hull shape for the shallow-V hull of the Sea Lark 2000; and such a substitution as made by Stuart and covered by the Stuart patent would not amount to a patentable invention (Findings 37–40).

42. Even if the substitution of a deep-V hull for the shallow-V hull of the Sea Lark 2000 could be considered as a patentable distinction, claims 1, 10 and 15 of the Stuart patent would still be invalid since the evidence establishes that Wollard constructed and successfully tested a deep-V tunnel boat having all of the features set forth in the Stuart patent claims in March of 1967, at least two months prior to the first tunnel boat built and tested by Stuart (Findings 14 and 36, supra).

43. The Wollard patent itself is also prior art which would render claims 1, 10 and 15 of the Stuart patent invalid for lack of invention. Wollard clearly and specifically discloses each and every stuctural feature of the claims of the Stuart patent (see Findings 26 and 36, supra) with the exception that Wollard does not specifically state that the propeller can be located in the tunnel as well as behind the tunnel. It would be obvious to a person of ordinary skill in

the art that if a full flow of water could be delivered through a tunnel to a propeller located behind the tunnel that there must be a full flow of water in the tunnel and a propeller would function at least equally well if located within the tunnel. The outboard embodiment is the true test of the concept and renders the inboard embodiment obvious (R. 376–377, 381–391).

44. Defendant contends that the Stuart patent is also invalid because the structure set forth in claims 1, 10 and 15 of the Stuart patent was invented by another and was in public use prior to the Stuart invention. This defense is based on a 47 foot boat known as "Big C" which was designed by Edward Weigl, constructed by Commodore Boat Company of New Bern, North Carolina, and launched in July of 1966. The "Big C" has been used as a pleasure craft by Weigl since it was launched in 1966 and is still active in use. Counsel for both parties, as well as their expert witness, actually rode on the boat and examined the boat structure on July 26, 1971. The "Big C" as originally launched included the following structural characteristics:

(a) A deep-V hull;

(b) The undersurface of the hull formed to define a water tunnel;

(c) The tunnel-forming surface extending below the operating water line of the hull;

(d) The tunnel being open at the stern of the boat;

(e) A propeller arranged for revolving in the tunnel which propeller is nearly the diameter of the tunnel;

(f) The propeller being substantially above the keel line of the hull;

(g) The propeller arranged to revolve in the tunnel forward of the stern end of the boat;

(h) A rudder arranged in the region of the stern end of the tunnel which extends down approximately to the bottom of the propeller; and

(i) A spray collar secured to the stern of the hull in the region of the tunnel close over the rudder.

Sometime in 1968, the tunnels on the "Big C" were enlarged in order to accommodate larger propellers. However, the basic structural relationship set forth above remained the same (PX 93–95; DX 55–62; DX 55, pp. 6–8, 12, 13, 17, 18–22; DX 61, pp. 4, 6; DX 62, pp. 4–5).

45. A comparison of claims 1, 10 and 15 of the Stuart patent with the "Big C" reveals that the "Big C" differs from claim 15 in that it has twin tunnels and twin propellers rather than a single tunnel and propeller in the center of the boat. The use of twin screws rather than a single screw is quite conventional and this difference between the "Big C" and the Stuart patent does not have any patentable significance. Indeed, Stuart's own patent (Fig. 7, Col. 4, lines 20–22) establishes the complete equivalence between these embodiments (PX 93–95; R 409–413).

46. The controversy between the parties as to whether or not the "Big C" anticipates the claims of the Stuart patent has centered around the question of whether or not the deep-V hull of the "Big C" is a deep-V "planing" hull, as required by claim 1 of the Stuart patent. Weigl, the designer and builder or the boat, unqualifiedly states that the "Big C" is and always has been a planing hull. Defendants' expert also insists that the "Big C" is a deep-V planing hull and that the "Big C" configuration is not only capable of achieving planing speeds, but, in fact, did achieve such speeds during the demonstration ride on July 26, 1971. On the other hand, plaintiff's expert expressed the opinion that the "Big C" is not a planing hull, is not capable of achieving planing speeds and did not achieve such speeds during the demonstration run in July, 1971 (DX 55, pp. 12, 14; R 397–413, 444–467, 480–494).

47. The Stuart patent in suit defines the term "planing hull" as follows: (Col. 3, lines 12–24)

"Hulls referred to within the spirit of the invention as 'planing' hulls are those that the displacement lift from buoyancy is replaced by dynamic lift as speed increases—dynamic lift being the force produced by water at relative

velocity impinging against the inclined bottom of the hull. Dynamic lift need not attain any particular percentage of the total lift, but in faster and lighter hulls, dynamic lift can approach 100% of the total lift at high speeds." This definition of "planing hull" is significant to a resolution of this controversy since whether or not the "Big C" is a "planing hull" must be determined by reference to what those words mean in the Stuart patent (PX 1; R 190, 400).

48. Defendants' expert, Mr. Hobbs, bases his opinion that the "Big C" is a planing hull on the definition of the term "planing hull" as it appears in the Stuart patent; on his personal observation of the operating characteristics and speed of the "Big C"; and on a mathematical formula known as the Taylor Speed/Length ratio. According to defendants' expert, if the ratio of the speed of the boat (in knots) to the square root of the waterline length of the boat (in feet) exceeds 2.0, the boat is planing. Defendants' expert estimated that the "Big C" traveled at about 20 miles per hour and achieved a Taylor Speed/Length ratio of 2.60. In his opinion the "Big C" was definitely planing. He also stated that the "Big C" has a hull configuration which makes the boat capable of achieving planing speeds, provided only that sufficient power is available to propel the boat. This conclusion is based upon the fact that a hull is normally considered to be a planing hull if it has a transverse section which is normal and has straight fore and aft lines in the after part of the boat. The deep-V configuration of the "Big C" is normal and the boat has straight fore and aft lines in the after portion of the boat (DX 65; R 398-406).

49. Plaintiff's expert, Mr. Van Patten, made it clear that his opinion that the "Big C" is not a planing hull and is incapable of planing, was not based upon the definition of "planing hull" which appears in the Stuart patent. Indeed, Mr. Van Patten specifically stated that he disagreed with the patent definition which would require that more than 50%

of the lift forces acting on the hull are dynamic lift forces. However, the definition of "planing" adopted by Mr. Van Patten contradicted his earlier direct testimony and his own prior paper which defines a Taylor Speed/Length ratio of 2.0 as the inception of planing rather than the ratio of 3.0 which he urged to be the correct ratio during trial. Mr. Van Patten's attempt to explain the inconsistency between his opinion at trial and his prior writings as a typographical error is not credible and casts doubt on the credibility of his entire expert opinion. In any event, since his opinion is not based upon the definition of "planing hull" as it appears in the Stuart patent, it is not entitled to any weight (PX 96; R 492-494, 505-512).

50. The Record is not clear as to whether the "Big C" possessed sufficient power as originally constructed in 1966 to achieve planing speeds. There is no question, however, that the "Big C" was designed to be a planing hull and has a hull configuration which is capable of achieving planing speeds if sufficiently powered (Finding 49, supra). Thus, the "Big C" which was constructed and launched almost two years before the filing of the patent application which resulted in the Stuart patent (but after Wollard made his invention, Findings 7 to 14, supra) contains all of the structural limitations defined in claims 1, 10 and 15 of the Stuart patent, and, therefore, anticipates those claims and renders them invalid.

*VI. The Stuart Patent Is Not Infringed*

51. Plaintiff charges that the Sea Lark 2300 is an infringement of claims 1, 10 and 15 of the Stuart patent. It does not charge that the Sea Lark 2000 is an infringement of the Stuart patent, and, of course, could not make that charge without also admitting the invalidity of the Stuart patent since the Sea Lark 2000 was constructed long prior to the invention which resulted in the Stuart patent. Since the only significant structural difference between the Sea Lark 2000 and the Sea Lark 2300

is the hull configuration—the former being a shallow-V hull in which the bottom side portions of the boat are at an angle of 5° with a horizontal at the stern (Finding 11, supra) and the latter being a modified V configuration including a flat center section (Finding 14, supra)—it is apparent that plaintiff deems the hull configuration to be a critical limitation in its patent claims (PX 35, 36, 38; R 111, 155).

52. The Stuart patent in suit defines a "deep-V hull" as follows: (Col. 3, lines 1–11)

> "A deep-V hull is generally characterized by a low keel line 11 with the bottom portions of the hull on either side of keel line 11 rising above the horizontal. For a hull to qualify as a 'deep-V' the angle of bottom portions 14 and 15 on opposite sides of keel line 11 must be from 8° to 25° above the horizontal at the stern 13. The angle of hull bottom portions 14 and 15 generally increases toward bow 12. The resulting deep-V botton knifes through the water to provide a smoother ride over waves and choppy surfaces than hulls with flat bottoms, round bottoms, or other configurations." (PX 1, Col. 3, lines 1–11)

The Sea Lark 2300 does not come within the definition of a deep-V hull as set forth in the Stuart patent for several reasons. First, since the Sea Lark 2300 has a flat section at its keel which extends from the transom of the boat to a point forward of the beginning of the tunnel and accounts for 37½% of the entire bottom surface, it does not have the sharp knifelike V which is typical of a deep-V hull and which would permit it, in the words of the Stuart patent, to " . . . knife[s] through the water to provide a smoother ride over waves and choppy surfaces than hulls with flat bottoms . . . " Second, the bottom side portions on either side of the keel of the Sea Lark 2300 do not rise above the horizontal at an angle of from 8° to 25°. If the keel of the Sea Lark 2300 is taken as a line through the center bottom portion of the hull, there is no angle of rise on the 2300 since the bottom side portions on either side of this line are part of the flat bottom section. If, on the other hand, the entire flat section of the bottom of the 2300 is defined as the keel line then there is a short, very sharp rise, of over 80° which leads to the sloping bottom side portions of the 2300. It is clear from the Record that the Sea Lark 2300 is a modification of a deep-V hull having bottom side portions which, prior to modification, rose at an angle of 30° above the horizontal at the keel and that this boat was modified by Wollard to include a flat section in order to improve the boat's stability and planing performance (PX 35–39; R 225–240, 354, 355, 437–442).

53. Plaintiff asserts that the Sea Lark 2300 has a "deadrise" angle of approximately 25°. This angle was determined by drawing a line from the center of the flat section (which plaintiff defines as the keel line of the Sea Lark 2300) to the chine of the boat. The angle which this line makes with a horizontal line drawn through the stern is known in the art as the "deadrise" angle. The line drawn by plaintiff in reaching the conclusion that the Sea Lark 2300 has a "deadrise" angle of approximately 25° was actually drawn through a portion of the cross-sectional configuration of the Sea Lark 2300 hull and, therefore, ignored the configuration of the hull. A determination of the "deadrise" angle of the Sea Lark 2300 is irrelevant to the issues in this case since the Stuart patent does not define or use that term in describing a deep-V hull. Moreover, plaintiff's expert witness acknowledges that measurements of the deadrise angle which ignore the actual hull configuration are not of value in determining the nature of the transverse hull configuration (PX 39; R 185–187, 208, 235, 236, 438–440).

54. While it is apparent that the Sea Lark 2300 is a modified form of a deep-V hull, it is not a deep-V hull as required by the Stuart patent and as defined in its claims. Therefore, the Sea Lark 2300 does not infringe claims 1, 10 and

15 of the Stuart patent. Plaintiff cannot properly insist that the deep-V hull configuration is critical and, at the same time, seek an interpretation of that limitation which is broader than the definition set forth in its patent in an attempt to establish infringement. Quite simply, plaintiff is caught on the horns of a dilemma. If it insists that a reasonable latitude of interpretation be given the words "deep-V" for the purpose of finding infringement, then a similar latitude must be applied in determining the validity of the Stuart claims. Obviously, this approach would merely reinforce the finding that the Stuart patent is invalid in view of the inboard Sea Lark 2000 (Findings 37 to 41, supra) since there is only a difference of 3° between the shallow-V Sea Lark 2000 hull and the lower limit of plaintiff's own definition of "deep'V hull."

### VII. The Stuart Patent Is Unenforceable

■ 55. A review of the file history of the Stuart patent and the correspondence between Stuart and his patent attorneys reveals that deliberate misrepresentations were made to the U. S. Patent Office in an attempt to make it appear that the Stuart patent was patentable over the best known prior art, including the Wollard patent. The misrepresentations occur in a letter to the Patent Examiner dated November 5, 1969, in which Stuart's patent counsel stated as follows:

"Before the application was filed, applicant made a preliminary patentability search, and discovered the following pertinent references in addition to the ones cited by the Examiner:

| | |
|---|---|
| 904,313 | Davis |
| 1,121,006 | Fauber |
| 1,827,806 | Aiken |
| 1,864,433 | Hanlon |
| 1,897,824 | Scholz |
| 1,991,512 | Miller |
| 2,283,291 | Selden |
| 2,328,041 | Wellons |
| 2,384,981 | Wallace |
| 2,729,183 | Owen |
| 2,784,691 | MacMillan, Jr. |
| 2,896,565 | Stevens |
| 3,469,557 | Wollard" |

(PX 41A–G, 43).

56. The November 5, 1969, statement includes two deliberate misrepresentations. First, in a letter of July 19, 1967, from the same patent counsel to Stuart in which the results of a prior art search were reported, counsel stated:

"The most pertinent patent of the ones enclosed is the Titcomb patent which shows a planing hull having a tunnel rising upward to the stern to form a recess for the screw."

\* \* \* \* \* \*

"The Fauber and Owen patents do not appear particularly pertinent."

\* \* \* \* \* \*

"We will reserve final judgment on this search until after we see the remaining four patents. However, the Titcomb patent will present the serious obstacle of any patenting of your tunnel."

Despite the advice rendered to the client, patent counsel elected to cite the Fauber and Owen patents to the Examiner in his letter of November 5, 1969, and to withhold the Titcomb patent (PX 41B, 43).

■ 57. The second significant misrepresentation in the November 5, 1969, letter to the Patent Office relates to counsel's citation of the Wollard patent. It is simply not true that patent counsel for Stuart discovered the Wollard patent as a result of a pre-examination search. The Wollard patent did not issue until September 30, 1969—slightly more than a month before the letter containing the misrepresentation was written to the Patent Office and more than one year after the filing date of the Stuart application. Moreover, it is clear from an inspection of the Stuart file history, that the Patent Examiner could not have been aware of the Wollard patent, since the Patent Office search was conducted on September 18, 1969, twelve

days prior to the issuance of the Wollard patent. Obviously, the purpose of this misrepresentation was to bury the Wollard patent in a long list of allegedly old prior art patents in the hope that the Patent Examiner, having already allowed the Stuart claims, would ignore the list and permit the Stuart patent to issue. Such conduct clearly violates the required standard of candor and fair dealing with the Patent Office. Stuart had a clear obligation to call the Wollard patent to the attention of the Patent Office in a proper fashion and to attempt to patentably distinguish his claimed invention from the disclosure of the Wollard patent. Had he done so, the Stuart patent may never have issued and a substantial portion of this litigation could have been avoided. The failure to take these affirmative steps, particularly when coupled with the misrepresentations which were actually made, renders the Stuart patent unenforceable (PX 28, 43).

### VIII. "Tunnel Drive" Is not a Valid Trademark

58. Plaintiff claims that it is the owner of the trademark "TUNNEL DRIVE" as applied to boats having the tunnel construction of the patents in suit and that defendants have infringed this trademark by using that designation on its own boats. Defendants concede that they have used the words "tunnel drive" in connection with their boats but assert that those words are merely a descriptive designation of the boats in question and cannot be monopolized as a trademark (Pre-trial Stip., par. 7I, 7K).

59. There is no question that the words "tunnel drive" describe the types of boat to which that designation is applied. The boats do have a tunnel and the drive or propulsion means is located in the tunnel. Plaintiff concedes that the word "drive" preceded by some descriptive words such as "stern", "inboard" or "outboard" has been conventionally used in the boating industry to convey information concerning the manner in which a boat is powered. The evidence also establishes that plaintiff it-self originally adopted and used the words "Tunnel Drive" as a convenient descriptive designation for describing its boat rather than as a trademark. Between June and September, 1968, when plaintiff first began to use the designation "tunnel drive" as a trademark by actually applying the name to boats, there were numerous articles and advertisements which were either published by plaintiff or based on information supplied by plaintiff. All of these articles used the words "tunnel drive" as a means of describing the characteristics of boats having the tunnel structure. Indeed, the headline of a *New York Times* article published in June, 1968, is entitled "New Tunnel Drive Borrows From Old" and clearly establishes that the words "tunnel drive" were being used to describe a type of boat rather than as a trademark for a particular boat manufactured by Penn Yan (PX 14–16; DX 24–26; R 114–126).

60. A review of plaintiff's sales promotion literature even after it attempted to adopt the words "tunnel drive" as a trademark designation by placing the letters "TM" after each use of that phrase clearly establishes that plaintiff continues to use the words "tunnel drive" in a descriptive sense. A typical sales brochure uses phrases such as "available in tunnel drive or stern drive", "outboard or tunnel drive models", "the tunnel drive development . . ." and similar phrases which are indicative of the fact that the words "tunnel drive" describe a type of propulsion system (PX 20, 21).

61. The evidence also establishes that the words "tunnel drive" have been used by others to describe boats having tunnels of the type involved in this suit and that plaintiff acquiesced in such use. Specifically, "tunnel drive" was used as a descriptive designation by Commodore Boat Co. in publications which advertised Commodore boats (DX 31A, B, 33; R 131–133).

62. Since the evidence establishes that the primary significance of the words "tunnel drive" is as a descriptive designation for a boat having a tunnel,

plaintiff can only claim trademark rights in these words if it can establish that they have acquired a secondary meaning, i. e., they have, through extensive use, come to designate boats emanating from plaintiff rather than merely describing a general class of boats having particular characteristics which might be manufactured by anyone. The Record is devoid of any evidence which would establish that the public has come to know and recognize the words "tunnel drive" as plaintiff's trademark, and as a name for boats manufactured only by plaintiff, rather than as words describing a particular type of boat manufactured by plaintiff and possibly others. Indeed, the only evidence submitted by plaintiff is a group of letters which it received from potential customers in response to advertisements. The letters do not satisfy plaintiff's burden of proof, particularly since they tend to indicate that the words "tunnel drive" were used descriptively by the customers and were not recognized as having trademark significance (PX 24, 25; R 94, 95).

63. It appears that to the extent that the words "tunnel drive" have been identified with plaintiff, the identification is due solely to the fact that plaintiff has been the almost exclusive source of tunnel boats since 1968, and, for that reason alone, the public has come to know and recognize Penn Yan as being prominent in the sale of tunnel boats. For example, the evidence establishes that several visitors to the Sea Lark exhibit at the 1971 Miami Boat Show confused the Sea Lark tunnel boat with the Penn Yan tunnel boat despite the fact that defendants did not use the words "tunnel drive" at that exhibit. Plaintiff is not entitled to an indefinite monopoly over words which would normally be used to describe these boats simply because it was the first to commercially exploit the boats on a large scale. The words are open to use as words of description by all who use or sell such boats (PX 91; R 265, 266, 287–293).

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and over the subject matter of this suit. Venue is properly laid in this district.

2. Plaintiff has title to United States Letters Patent No. 3,515,087 and is the owner of all rights thereunder, including the right to sue for injunction and to recover damages for infringement.

3. Defendant Wollard has title to United States Letters Patent No. 3,469,-557 and is the owner of all rights thereunder, including the right to sue for injunction and to recover damages for infringement.

4. Claims 18, 19 and 20 of the Wollard patent are not invalid under the so-called doctrine of "late claiming" as expressed in Muncie Gear Works, Inc. v. Outboard Marine & Manufacturing Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942) since those claims were adequately supported by the original Wollard patent application filed on May 1, 1967. Tubular Service & Engineering Company v. Sun Oil Company, 220 F.2d 27 (5th Cir. 1955); Hunt Industries, Inc. v. Fibra Boats, Inc., 299 F. Supp. 1145 (S.D.Fla.1969). Moreover, since claims 18 to 20 of the Wollard patent were supported by the original Wollard disclosure, plaintiff cannot claim that it has intervening rights based upon an alleged use of the invention prior to the date on which those claims were first presented to the Patent Office. Diamond International Corporation v. Walterhoefer, 289 F.Supp. 550 (D.Md. 1968.) The fact that the Patent Office allowed claims 18 to 20 of the Wollard patent without objection thereto as new matter under 35 U.S.C. Section 132 is entitled to an especially weighty presumption of correctness. Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D.Ill.1966), aff'd. 385 F.2d 391 (7th Cir. 1967).

5. Claims 18, 19 and 20 of the Wollard patent are entitled to be read in

their normal and natural sense in accordance with their unambiguous language. Graver Tank & Mfg. Co. v. Linde Air Products Co., 399 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Williams Bit & Tool Co. v. Christensen Diamond Products Co., 399 F.2d 628 (5th Cir. 1968); Cameron Iron Works, Inc. v. Stekoll, 242 F.2d 17 (5th Cir. 1957). It is also a well established rule of claim construction that a broad claim will not be construed to contain limitations expressed in a more narrow claim. Cameron Iron Works v. Stekoll, *supra*. The limitation which plaintiff seeks to read into claims 18 to 20 of the Wollard patent are specifically set forth in other claims of that patent. Moreover, the claims of a patent need not be limited to the preferred embodiments shown in the specification but may be set forth as broadly as the prior art allows. Stearns v. Tinker & Rasor, 252 F.2d 589 (9th Cir. 1957); Bela Seating Company v. Poloron Products, Inc., 297 F.Supp. 489 (N.D.Ill. 1968).

6. Claims 18, 19 and 20 of the Wollard U. S. Letters Patent No. 3,469,557 are infringed by boats incorporating tunnels which were manufactured and sold by plaintiff.

7. The prior art relied on by plaintiff does not constitute an anticipation of claims 18, 19 and 20 of the Wollard patent under 35 U.S.C. § 102. Anticipation can exist only where a single prior art reference teaches the same elements as claimed, united in the same way to perform an identical function. Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., 436 F.2d 1180 (7th Cir. 1971); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 398 (10th Cir. 1965); cert. denied 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966).

8. The sketch of an alleged prior art boat built by Edward Weigl is not prior art since its existence and structure were not established by clear and convincing evidence. Inglett & Company, Inc. v. Everglades Fertilizer Company, Inc., 255 F.2d 342 (5th Cir. 1958).

9. The Court has given due consideration to the scope and content of the Weigl sketch and the *Motor Boating* article describing a boat known as the "Sandpiper" and the differences between this prior art and claims 18 to 20 of the Wollard patent and concludes that the differences between the prior art and the invention set forth in claims 18 to 20 of the Wollard patent are such that the invention would not have been obvious to a person of ordinary skill in the art at the time the invention was made, 35 U.S.C. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

10. The Sea Lark 2000, the deep-V boat built by Wollard in March, 1967, and the "Big C" are prior art with respect to claims 1, 10 and 15 of the Stuart patent under the provisions of 35 U.S.C. § 102(a), (b) and (g). Each of these boats was conceived and reduced to practice and was a complete and operative device prior to the alleged date of the invention defined in claims 1, 10 and 15 of the Stuart patent in suit. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Connecticut Valley Enterprises, Inc. v. United States, 348 F.2d 949, 172 Ct.Cl. 468 (1965); Stearns v. Tinker & Rasor, *supra*. All of these boats were clearly in public use for more than one year prior to the filing date of the application which resulted in the Stuart patent and, in the case of the Sea Lark 2000, the boat was actually sold more than one year prior to that date. Bourne v. Jones, 114 F.Supp. 413 (S.D.Fla.1951), aff'd. 207 F.2d 173 (5th Cir. 1953), cert. denied 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398 (1953). None of these prior structures were abandoned, suppressed or concealed by their inventors. International Glass Co. v. United States, 408 F.2d 395, 187 Ct.Cl. 376 (1969).

11. The Wollard patent which is based upon an application for patent

filed prior to the alleged date of the Stuart invention is prior art with respect to the claims of the Stuart patent under the provisions of 35 U.S.C. § 102(e). Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965).

12. Claims 1 and 10 of the Stuart patent are directly anticipated by the "Big C" and the minor difference between claim 15 of the Stuart patent and the "Big C" structure would clearly have been obvious to a person of ordinary skill in the art at the time the alleged Stuart invention was made and claims 1, 10 and 15 of the Stuart patent are therefore invalid, 35 U.S.C. §§ 102, 103. To the extent that it can be argued that there are differences between claims 1 and 10 of the Stuart patent and the "Big C", e. g., that the original "Big C" lacked sufficient power to achieve planing speeds, these differences would also be obvious to a person of ordinary skill in the art.

13. Claims 1, 10 and 15 of the Stuart patent in suit are invalid since they are directly anticipated by the deep-V boat constructed by Wollard in 1967, 35 U.S.C. § 102(a), (b) and (g).

14. The Court has given due consideration to the structure of the Sea Lark 2000, the alleged differences between that structure and claims 1, 10 and 15 of the Stuart patent and the level of skill in the relevant art at the time the alleged Stuart invention was made and concludes that claims 1, 10 and 15 of the Stuart patent are invalid for obviousness, 35 U.S.C. § 103; Graham v. John Deere Co., *supra*.

15. The Court has given due consideration to the scope and content of the Wollard patent, the alleged differences between the teachings of the Wollard patent and the structure defined in claims 1, 10 and 15 of the Stuart patent and the level of skill in the relevant art to which the alleged Stuart invention

pertains and concludes that the Stuart patent in invalid for obviousness, 35 U.S.C. § 103.

16. Claims 1, 10 and 15 are not infringed by defendants' Sea Lark 2300 since that boat does not include a deep-V hull as defined in the Stuart patent. The specific definition of "deep-V hull" set forth in the Stuart specification limits the interpretation of those words. Harrington Manufacturing Co. v. White, 323 F.Supp. 1345 (N.D.Fla. 1971). The doctrine of equivalence cannot be applied under the circumstances of this case for the purpose of establishing infringement, Phillips Petroleum Co. v. Sid Richardson Carbon & Gas Co., 416 F.2d 10 (5th Cir. 1969); Sisko v. Southern Resin & Fiberglass Corp., 248 F.Supp. 797 (S.D.Fla.1965). A broadened interpretation of the words "deep-V hull" which ignores the definition set forth in the Stuart patent would result in direct anticipation of the claims by the Sea Lark 2000. Claims cannot be broadly construed to make out infringement and narrowly construed to avoid invalidity. International Glass Company v. United States, 408 F.2d 395, 187 Ct.Cl. 376 (1969); Wire Tie Machinery Co. v. Pacific Box Corp., 107 F.2d 54 (9th Cir. 1939) and Emery Industries, Inc. v. Schumann, 111 F.2d 209 (7th Cir. 1940).

17. The misrepresentations which were made to the Patent Office during the course of prosecuting the application which resulted in the Stuart patent, including the failure of Stuart's attorneys to cite the most pertinent prior art, are inequitable conduct which renders the Stuart patent invalid or at least unenforceable. Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir. 1970), cert. denied 400 U.S. 956, 91 S.Ct. 353, 354, 27 L.Ed.2d 264 (1971); SCM Corp. v. Radio Corporation of America, 318 F.Supp. 433 (S.D.N.Y.1970).

18. Plaintiff has not met its burden of proving that the words "tun-

nel drive" have acquired a secondary meaning and should therefore be protected as a trademark. Aloe Creme Labs., Inc. v. Milsan, Inc., 423 F.2d 845 (5th Cir. 1970). The fact that plaintiff and others have used the words "tunnel drive" as descriptive words to describe boats having a tunnel structure rather than to designate a specific source of origin establishes that the words are incapable of functioning as a trademark. Vandenburgh, Trademark Law and Procedure (2d Ed.), § 123. It is of no significance that plaintiff may have been the first to use these words in connection with such boats, Scholer Brothers, Inc. v. Hans C. Bick, Inc., 110 U.S.P.Q. 431 (Com. of Pat. 1956), since no one can claim protection for the exclusive use of a name which would practically give him a monopoly in the sale of goods made by other producers. R. L. Bennett & Sons v. Farmers' Seed & Gin Co., 288 F. 365 (5th Cir. 1923), cert. denied 263 U.S. 704, 44 S.Ct. 34, 68 L.Ed. 516 (1923); 3 R.Callman, Unfair Competition Trademarks and Monopolies (3rd Ed.) Section 70.1.

19. Plaintiff's inequitable conduct before the United States Patent Office and its continued prosecution of this litigation despite its knowledge of the prior public use and sale of the Sea Lark 2000 and its knowledge that the Wollard patent was prior art makes this an "exceptional" case under the provisions of 35 U.S.C. § 285. Defendants are therefore entitled to that portion of their counsel fees which is attributable to defending the claim that the Stuart patent was valid and infringed.

20. Defendants are entitled to an injunction against further infringement by plaintiff of claims 18, 19 and 20 of U. S. Patent No. 3,469,557; to an accounting by, and the recovery from plaintiff of their damages in accordance with 35 U.S.C. § 284; their attorneys' fees as specified above; and to a recovery of their costs in this litigation.