**MOLINS PLC, Plaintiff–Appellant,**

**and**

**John Coventry Smith, Jr., Plaintiff–Appellant,**

v.

**TEXTRON, INC., Kearney & Trecker Corporation, and Avco Corporation, Defendants–Appellees.**

**Nos. 94–1199 to 94–1201 and 94–1215.**

United States Court of Appeals, Federal Circuit.

Feb. 16, 1995.

Rehearing Denied March 15, 1995.

1174

· Rudolph E. Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE, argued for plaintiff-appellant, Molins, PLC. With him on the brief were Arthur G. Connolly, Jr., and Patricia Smink Rogowki. Also on the brief was Charles E. Pfund, Greenfield & Sacks, Boston, MA. Scott L. Nelson, Miller, Cassidy, Larroca & Lewin, Washington, DC, argued for plaintiff-appellant, John Coventry Smith, Jr. With him on the brief were R. Stan Mortenson and Lisa D. Burget. Also on the brief was William K. West, Jr., Cushman, Darby & Cushman, Washington, DC, of counsel.

Willem G. Schuurman, Arnold, White & Durkee, of Austin, TX, argued for defendants-appellees. With him on the brief was Richard D. Egan. Of counsel was Eric B. Meyertons. John S. Pacocha, Law Offices of Dick & Harris, of Chicago, IL, argued for defendants-appellees. With him on the brief were Richard E. Dick and Howard E. Silverman.

Opinion for the court filed by Circuit Judge LOURIE, in which Circuit Judge NIES joined as to part A1 and filed a separate opinion dissenting as to parts A2, A3, A4, and B; and Circuit Judge PAULINE NEWMAN joined except that she filed a separate opinion concurring in the judgment as to part A4.

LOURIE, Circuit Judge.

Molins PLC and John Coventry Smith, Jr. appeal from a judgment of the United States District Court for the District of Delaware holding U.S. Patents 4,369,563 and 4,621,410 unenforceable due to inequitable conduct and awarding attorney fees, costs, and expenses against Molins and Smith, jointly and severally. *Molins PLC v. Textron, Inc.*, Civ. Nos. 86–446–JJF, 87–275–JJF, and 87–163–JJF (D.Del. Feb. 1, 1994) (amended final judgment).[1] We affirm-in-part, vacate-in-part, and remand.

## BACKGROUND

Molins is a United Kingdom limited liability corporation, having its principal office at Milton Keynes, England. Between 1963 and 1973, Molins operated a machine tool division for the design, manufacture, and sale of machine tools used in the high speed machining of light alloys.

In 1965, Molins' Research Director, Dr. David Williamson, developed a method for improving batch machining involving a plurality of machine tools arranged to accommodate the manual transport of pallet-mounted

1. The amended final judgment incorporated the memorandum opinion of November 24, 1992, reported as *Molins PLC v. Textron, Inc.*, 821 F.Supp. 1551, 26 U.S.P.Q.2d 1889 (D.Del.1992), and the memorandum opinion of December 30, 1993, reported as *Molins PLC v. Textron, Inc.*, 840 F.Supp. 306, 30 U.S.P.Q.2d 1054 (D.Del. 1993).

workpieces to and from the machine tools (the "batch process"). Molins filed a British patent application for the batch process in the fall of 1965 and filed counterpart applications in a number of countries, including the United States.

In 1966, Williamson invented a fully automated machining system that allows several related families of parts to be machined simultaneously (the "system 24"). Molins filed patent applications for the system 24 in the United Kingdom, the United States, and in other countries during 1966–67. In 1967, the U.S. batch process application was combined with the U.S. system 24 application in a continuation-in-part. The '563 patent later matured from a continuation-in-part of the combined U.S. application.[2] Before the patent issued in January of 1983, however, the batch process claims were cancelled and only claims drawn to the system 24 apparatus issued. The '410 patent issued from a divisional application and is directed to the system 24 method of machining.

The '563 patent discloses a system of complementary, numerically-controlled machine tools. Materials to be machined, or "workpieces," are subjected to selected machining operations on selected machine tools in a selected order by the delivery of common form pallets loaded with the workpieces. Transporters deliver pallets between the machine tools, a storage rack, and work stations where the workpieces are automatically delivered in bins from a bin store and are loaded on the pallets. Tool magazines are delivered between a rack and the machine tools by a transporter. A computer controls transport and machining operations, and re-ceives signals from monitors indicating the location of pallets, tool magazines, and bins.

Dennis Whitson began working for Molins in 1967 as one of several British chartered patent agents working in Molins' in-house patent department. He managed Molins' patent department from 1974 through 1981 and was responsible for the prosecution of all of Molins' patent applications directed to the batch process and system 24 inventions. When Whitson retired in 1981, Ivan Hirsh, employed by Molins since 1968, assumed the responsibilities as manager of Molins' patent department. After becoming manager, Hirsh assumed responsibility for prosecuting the applications relating to the patents in suit and for conducting the litigation involving Molins' patents.

Smith served as the primary United States counsel to Molins, representing Molins at the United States Patent and Trademark Office ("PTO") from 1966 through the relevant time period in this case.[3] Beginning in 1967, Smith prosecuted the patent applications leading to the issuance of the '563 and '410 patents. In January of 1980, Molins assigned a one-half interest in the patent applications to Smith in exchange for Smith's agreement to undertake further prosecution at his own expense. In July of 1988, Smith reassigned his interest in the patents to Molins. Smith remained entitled to one-half of all royalty income received by Molins from licenses under the patents entered into prior to July 1, 1988.

Between the fall of 1967 and April 1968, while the relevant U.S. patent applications were pending, Molins' patent department, and specifically Whitson, became aware of prior art referred to here as the "Wagenseil reference."[4] Upon evaluating the Wagenseil

2. The '563 patent issued on January 25, 1983. It matured from the following series of applications: Serial No. 85,289, filed October 29, 1970, which is a continuation-in-part of Serial No. 695,817, filed December 4, 1967, which is a continuation-in-part of Serial No. 578,318, filed September 9, 1966 and Serial No. 636,993, filed May 8, 1967. The '410 patent issued on November 11, 1986 and is a division of Serial No. 85,289. Throughout the prosecution of the series of patent applications that ultimately issued as the patents in suit, foreign priority was claimed under 35 U.S.C. § 119 from the United Kingdom patent applications filed during the years 1965–1967.

3. Smith was a member of the law firm Watson, Cole, Grindle and Watson, but left the firm, taking several Molins matters with him, including the Williamson applications that subsequently issued as the '563 and '410 patents.

4. By "Wagenseil reference" or "Wagenseil," we refer to one or more of several articles, written by William Wagenseil et al., published between 1958 and 1962, which, for purposes of this case, disclose the same relevant subject matter. The articles disclose an automatic manufacturing system used to make a number of parts using a delivery system under the direction of a central control.

reference, Whitson concluded that it fully anticipated the "batch process" claims that Molins initially filed in the United Kingdom and in many other countries including the United States. Accordingly, in 1968 and 1969, Whitson abandoned all the foreign patent applications to the batch process. However, Whitson decided not to abandon the pending U.S. application because it contained both batch process and system 24 claims.

Prosecution of the U.S. and foreign system 24 applications continued. Wagenseil was cited to and by several foreign patent offices, but was not cited by Molins to the PTO. In 1975, Whitson told Smith that there were oppositions to the German system 24 patent application, but he did not inform Smith of the art cited in Germany, which included the Wagenseil reference. Eventually, Molins abandoned all foreign system 24 applications. In the United States, the '563 patent issued in January of 1983, after Molins prevailed in an interference with two other parties.

Later in 1983, Hirsh reviewed the files of the foreign system 24 applications, all of which had been abandoned in the late 1970s. Hirsh found the references that had been cited in the foreign patent prosecution, but not the PTO, including the Wagenseil reference. Hirsh also found Whitson's correspondence relating to the references and to their citation to and by foreign patent offices. Hirsh then informed Smith of the foreign citations. Together, they consulted with outside counsel and, on September 21, 1984, although the '563 patent had already issued, filed a lengthy prior art statement under 37 C.F.R. § 1.501 (Rule 501) on behalf of Molins, listing the Wagenseil reference together with all other prior art references that had been cited during the foreign prosecution.

In October of 1984, Cross & Trecker, Incorporated, the parent corporation of defendant Kearney & Trecker Corporation, filed a request for reexamination of the '563 patent in view of several IBM references. Cross & Trecker filed a Form PTO–1449 listing Wagenseil, which was initialed by the examiner as having been considered in June of 1985.

During the reexamination, Molins referred the examiner to the Rule 501 prior art statement previously filed in the '563 patent file. The examiner indicated that, in order to make the prior art of record, Molins was required to submit English language translations of the foreign language references. Accordingly, Molins filed the translations and a brief statement of the relevance of the cited art. The examiner initialed each reference Molins had listed, indicating that he had considered it. The examiner's final office action in the reexamination stated that he had considered all of the cited references. No claims were rejected based on Wagenseil during the reexamination. Re–Examination Certificate B1 4,369,563 was issued on May 13, 1986.

Late in 1986, Molins and Smith filed suit against Textron, Incorporated, Kearney & Trecker, and Avco Corporation (collectively "Textron"),[5] alleging infringement of the '563 and '410 patents. In February of 1989, after approximately three years of discovery, Textron filed a summary judgment motion asserting that the patents were unenforceable due to inequitable conduct in connection with the prosecution of the '563 patent, in particular, concealment of Wagenseil and other information from the PTO. The motion was denied. After more discovery, in June of 1990, Textron again moved for summary judgment, adding new allegations of inequitable conduct relating to Smith's failure to disclose to the PTO allegedly material information regarding a copending patent application in the name of Jerome Lemelson, whom Smith also represented. Again, the court denied summary judgment. The court severed the issue of inequitable conduct, and held a bench trial.

On November 24, 1992, the court held that both patents were unenforceable due to inequitable conduct. *See supra* note 1. The court found the case to be "exceptional" within the meaning of 35 U.S.C. § 285 and ordered further briefing on whether attorney fees should be awarded. On December 30, 1993, the court held Molins and Smith jointly

---

5. Molins also sued Cincinnati Milacron, Incorporated and several West German companies. Cincinnati Milacron settled after trial and was dismissed from the case. The German companies voluntarily dismissed their appeal here.

and severally liable for all the defendants' attorney fees, costs, and expenses. *Id.* An amended final judgment was issued, deferring the calculation of fees until after the disposition of Molins' and Smith's present appeals from that judgment.

## DISCUSSION

### A. Inequitable Conduct

Applicants[6] for patents are required to prosecute patent applications in the PTO with candor, good faith, and honesty. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). This duty extends also to the applicant's representatives. *See FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415 n. 8, 5 USPQ2d 1112, 1115 n. 8 (Fed.Cir.1987) (the knowledge and actions of an applicant's representative are chargeable to the applicant). A breach of this duty constitutes inequitable conduct.

Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. *See J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed.Cir. 1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).[7] One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO. *FMC,* 835 F.2d at 1415, 5 USPQ2d at 1115.

The withholding of information must meet thresholds of both materiality and intent. *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1567, 5 USPQ2d 1769, 1778 (Fed.Cir.) ("[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct."), *cert. denied,* 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). Once threshold findings of materiality and intent are established, the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred. *J.P. Stevens,* 747 F.2d at 1559–60, 223 USPQ at 1092. In light of all the circumstances, an equitable judgment must be made concerning whether the applicant's conduct is so culpable that the patent should not be enforced. *LaBounty Mfg., Inc. v. International Trade Comm'n,* 958 F.2d 1066, 1070, 22 USPQ2d 1025, 1028 (Fed.Cir.1992).

The ultimate determination of inequitable conduct is committed to the trial judge's discretion and is reviewed by this court under an abuse of discretion standard. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876, 9 USPQ2d 1384, 1392 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). To overturn such a determination, the appellant must establish that the ruling is based on clearly erroneous findings of fact or on a misapplication or misinterpretation of applicable law, or evidences a clear error of judgment on the part of the district court. *Id.* Findings of materiality and intent are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a) and will not be disturbed on appeal unless this court has a definite and firm conviction that a mistake has been committed. *Id.* at 872, 9 USPQ2d at 1389.

6. Under PTO rules, the duty to disclose information material to patentability rests on the inventor, on each attorney or agent who prepares or prosecutes an application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee, or with anyone to whom there is an obligation to assign the application. *See* 37 C.F.R. § 1.56 (1983). For convenience, we simply refer to "applicant" in this opinion.

7. The standard of proper conduct in the PTO as summarized in *J.P. Stevens* was applicable as early as 1973–74, *see Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 551–52, 16 USPQ2d 1587, 1593 (Fed.Cir.1990), which includes a significant portion of the time period during which the patent applications leading to the '563 patent were pending.

### 1. Whitson's Nondisclosure of Wagenseil During Original Prosecution

■ Calling this case "the exceptional case among exceptional cases," the district court concluded that Whitson, Molins' in-house patent agent, had engaged in inequitable conduct in the procurement of the '563 patent because he failed to disclose Wagenseil to the PTO, even though he knew it was highly material. The court stated that "[a]lthough [Textron has] not produced direct evidence of Whitson's intent to deceive, i.e. there are no 'smoking memos' implicating bad faith on the part of Whitson, the overwhelming circumstantial evidence presented in this case leaves little doubt that Whitson intentionally concealed the Wagenseil reference from the U.S. PTO knowing that it was highly material to the U.S. applications."

Although Molins concedes that Wagenseil is highly material to the batch process invention, Molins asserts that the court erred in finding that Wagenseil was material to the '563 patent claims, which relate only to the system 24 invention. Molins points out that, although Wagenseil was cited to and considered by the examiner during reexamination of the '563 patent and during examination of the divisional '410 patent, Wagenseil was not relied upon by the examiner to reject pending claims. According to Molins, Wagenseil was *ipso facto* not material.

■ Information is "material" when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent. *In re Jerabek*, 789 F.2d 886, 890, 229 USPQ 530, 533 (Fed.Cir.1986).[8] If the information allegedly withheld is not as pertinent as that considered by the examiner, or is merely cumulative to that considered by the examiner, such information is not material. *See. Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582, 18 USPQ2d 1001, 1014–15 (Fed.Cir.1991).

■ We have held that the result of a PTO proceeding that assesses patentability in light of information not originally disclosed can be of strong probative value in determining whether the undisclosed information was material. *See J.P. Stevens*, 747 F.2d at 1562, 223 USPQ at 1094 (reasonable rejection of claims in reliance on a reference during reissue proceeding established materiality of that reference). However, the standard to be applied in determining whether a reference is "material" is not whether the particular examiner of the application at issue considered the reference to be important; rather, it is that of a "reasonable examiner." *Western Electric Co. v. Piezo Tech., Inc.*, 860 F.2d 428, 433, 8 USPQ2d 1853, 1857 (Fed. Cir.1988). Nor is a reference immaterial simply because the claims are eventually deemed by an examiner to be patentable thereover. *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421, 10 USPQ2d 1682, 1686 (Fed.Cir.1989) ("That the claimed invention may have been superior . . . to both the cited and withheld prior art may be a basis for patentability; it cannot serve automatically to render the withheld prior art either cumulative or immaterial."); *A.B. Dick*

---

**8.** The duty to disclose information material to patentability has been codified in 37 C.F.R. § 1.56 (Rule 56), which was promulgated pursuant to 35 U.S.C. §§ 6 and 131. From 1977 to 1992, Rule 56 defined information as "material" when "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." We have adopted this standard as the threshold standard of materiality. *See LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1074, 22 USPQ2d 1025, 1031 (Fed.Cir.1992). In 1992, the PTO changed Rule 56 to provide that information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56 (1992). "[A]dministrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988); *see also* 57 Fed.Reg. 2021 (Jan. 17, 1992) (PTO notice of final rulemaking stating that new Rule 56 will be applicable to all applicants and reexamination proceedings pending or filed after March 16, 1992). We thus make no comment regarding the meaning of new Rule 56.

*Co. v. Burroughs Corp.*, 798 F.2d 1392, 1396, 230 USPQ 849, 854 (Fed.Cir.1986) (that the claims may be patentable over the withheld prior art is not the test for materiality). Thus, the fact that the examiner did not rely on Wagenseil to reject the claims under reexamination or the '410 method claims is not conclusive concerning whether the reference was material.

The court found that Wagenseil was material because, among other things, it showed a storage and retrieval system in combination with a transfer system, a combination for which the examiner had relied upon two, separate references to reject the '563 patent application claims. *See In re Jerabek*, 789 F.2d at 890, 229 USPQ at 533 (withheld reference was highly material when no single piece of cited prior art taught the combination present in the reference). Moreover, the court found that Wagenseil disclosed relevant features beyond that shown in the prior art; in particular, Wagenseil disclosed a capability for workpieces to recirculate into a machining system and for workpieces to bypass certain machine tools within the system. None of the other prior art systems taught the "recirculate" and "bypass" features taught by Wagenseil. *See LaBounty*, 958 F.2d at 1075–76, 22 USPQ2d at 1032 (undisclosed prior art items are material when they disclose more relevant features than cited items).

The court further based its finding of materiality on extensive evidence showing that Whitson indicated during foreign prosecution that Wagenseil was the most relevant prior art to the corresponding foreign system 24 applications of which he was aware.[9] Also, the evidence showed that patent examiners in several foreign countries considered Wagenseil material to the system 24 claims and that Whitson had amended and distinguished system 24 claims in foreign patent offices over Wagenseil. In this regard, the court

was mindful of the risk in relying on foreign patent prosecution in light of differences in disclosure requirements, claim practice, form of application, and standard of patentability. *Cf. Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 n. 2, 30 USPQ2d 1377, 1379 n. 2 (Fed.Cir.1994) ("[T]he theories and laws of patentability vary from country to country, as do examination practices."); *but see* Manual of Patent Examining Procedure ("MPEP")[10] § 2001.06(a) (4th ed., rev. 8, Oct. 1981) ("Applicants ... have a duty to bring to the attention of the Office any material prior art or other information cited or brought to their attention in any related foreign application. The inference that such prior art or other information is material is especially strong where it is the only prior art cited or where it has been used in rejecting the claims in the foreign application."). On the evidence presented, even that independent of the admissions in the foreign prosecution, we cannot say that the court clearly erred in finding that a reasonable examiner would have considered Wagenseil important in deciding the patentability of the pending system 24 claims in the U.S. application.

Molins next argues that the court erred in finding that Whitson possessed the requisite intent to deceive the PTO. "Intent" commonly means: "Design, resolve, or determination with which [a] person acts[; a] state of mind in which a person seeks to accomplish a given result through a course of action." *Black's Law Dictionary* at 810 (6th ed. 1990). Intent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor. *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151, 219 USPQ 857, 861 (Fed.Cir.1983). Generally, intent must be inferred from the

9. In a response to the German Patent Office, for example, Whitson cited a number of prior art references, including others cited in the United States, and stated that, "in the opinion of the applicant, the [Wagenseil reference] comes closest to the subject of the application."

10. "The MPEP [is] commonly relied upon as a guide to patent attorneys and patent examiners

on procedural matters." *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439, 221 USPQ 97, 107 (Fed.Cir.1984). While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith. *Id.* at 1439, 221 USPQ at 107.

facts and circumstances surrounding the applicant's conduct. *Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*, 984 F.2d 1182, 1189–90, 25 USPQ2d 1561, 1567 (Fed.Cir.1993).

"The drawing of inferences, particularly in respect of an intent-implicating question ... is peculiarly within the province of the fact finder that observed the witnesses." *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110, 231 USPQ 185, 192 (Fed.Cir. 1986). Since the fact-finder has personally heard the testimony and observed the demeanor of the witnesses, we accord deference to the fact-finder's assessment of a witness's credibility and character. *See General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411, 30 USPQ2d 1149, 1154 (Fed.Cir.1994). However, "[g]iven the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939, 15 USPQ2d 1321, 1327 (Fed.Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990). *See also Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H.*, 945 F.2d 1546, 1554, 20 USPQ2d 1332, 1339 (Fed.Cir. 1991) ("Forfeiture [of enforceability] is not favored as a remedy for actions not shown to be culpable.").

While intent to deceive the PTO may be found as a matter of inference from circumstantial evidence, circumstantial evidence cannot indicate merely gross negligence. *Kingsdown*, 863 F.2d at 876, 9 USPQ2d at 1392 ("[A] finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.").[11] "[C]ourts must view the involved conduct 'in light of all the evidence' and must then determine whether that conduct in its totality manifests a sufficiently culpable state of mind to warrant a determination that it was inequitable." *Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 809, 15 USPQ2d 1481, 1484 (Fed.Cir.1990).

Thus, the alleged conduct must not amount merely to the improper performance of, or omission of, an act one ought to have performed. Rather, clear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz.*, misleading or deceiving the PTO. In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.

The court based its finding of intent on the following evidence. Whitson, a seasoned patent practitioner, who was aware of the duty to disclose material information to the PTO, knew of a highly material reference but did not cite it, or any other reference, to the PTO during the entire 13 years in which he was involved in prosecuting the U.S. patent applications that led to the '563 patent. During the time the applications were pending, Whitson represented to foreign patent offices that Wagenseil was the closest prior art. Whitson was on several occasions reminded of Wagenseil's materiality through its prominence in the prosecution of several foreign counterpart applications with which Whitson was intimately involved. The court rejected Molins' argument that Whitson had acted in good faith and simply overlooked Wagenseil, since he or his associates had focused on that reference several times during more than ten years of foreign prosecution and never cited Wagenseil during 13 years of prosecution. Under these circumstances, we cannot say that the court improperly inferred that Whit-

---

**11.** This court's *in banc* decision in *Kingsdown* resolved conflicting precedent regarding whether a finding of gross negligence compels a finding of intent to deceive. *Compare J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1564, 223 USPQ 1089, 1092 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985) (gross negligence was sufficient to prove intent, whereas simple negligence, oversight, or an erroneous judgment made in good faith was insufficient) *with FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n. 9, 5 USPQ2d 1112, 1116 n. 9 (Fed.Cir.1987) (gross negligence alone did not mandate a finding of intent to mislead).

son made a deliberate decision to withhold a known, material reference. Failure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional.

Issues of inequitable conduct are most difficult both for trial courts and reviewing appellate courts. One who has engaged in inequitable conduct has inflicted damage on the patent examining system, obtaining a statutory period of exclusivity by improper means, and on the public, which must face an unlawfully-granted patent. Loss of one's patent and damage to reputation are justified penalties for such conduct. On the other hand, unjustified accusations of inequitable conduct are offensive and unprofessional. They have been called a "plague" on the patent system. See Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422, 7 USPQ2d 1158, 1161 (Fed.Cir.1988) ("[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague."). Unjustified accusations may deprive patentees of their earned property rights and impugn fellow professionals. They should be condemned.

Separating one from the other is a difficult task assigned to trial courts, who have the opportunity to find facts, hear witnesses, and judge credibility. Were we to have been in the trial court's shoes in this case, we do not know how we would have come out. We are, however, "only" the reviewing court, obligated to determine whether the court misapplied the law, made clearly erroneous findings of fact, or abused its discretion. We do not believe it committed any of these errors with regard to Whitson's failure to cite Wagenseil.

We are mindful of the complexities of conducting a worldwide patent prosecution in a crowded art, attempting to represent one's client or company properly, and yet fulfill one's duty to various patent offices. Things can "fall through the floorboards" and not arise from an intent to deceive. We recognize that Wagenseil and other references from the foreign prosecution were cited eventually to the PTO and that the examiner initialed them and passed the reexamination application to issue thereafter. However, the references were not cited when they should have been. There were findings that Wagenseil was known to be material, and the trial court heard testimony and judged matters of credibility concerning intent. Those who are not "up front" with the PTO run the risk that, years later, a fact-finder might conclude that they intended to deceive. That is what appears to have happened here and we must affirm the trial court with respect to Whitson's behavior.

Molins has not persuaded us that the trial court, which conducted a thorough and careful analysis of the case, clearly erred in determining that Whitson knew of a material reference and that he intentionally withheld it from the PTO. We therefore conclude that the court did not make clear errors of fact and did not abuse its discretion in determining that Whitson's nondisclosure of Wagenseil amounted to inequitable conduct. Having determined that inequitable conduct occurred in the procurement of the '563 patent, all claims of that patent are accordingly unenforceable. See Kingsdown, 863 F.2d at 877, 9 USPQ2d at 1392.

The court also concluded that the inequitable conduct in the prosecution of the '563 patent extended to the '410 patent, since that patent "relied on the '563 patent." See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245–47, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933); Driscoll v. Cebalo, 731 F.2d 878, 884–85, 221 USPQ 745, 750 (Fed. Cir.1984). This determination has not been challenged by appellants. Thus, the '410 patent is unenforceable as well.

We next examine the remaining instances of involved conduct, not because they alter the patents' unenforceability, but because of their impact on the court's finding of an exceptional case and consequent award of damages.

2. *Hirsh's and Smith's Post–Issuance Disclosure of Wagenseil*

■ The court determined that Hirsh and Smith, once they discovered Wagenseil, "buried" it by submitting it with a large group of other prior art and, in doing so, attempted to deceive the PTO.

Upon issuance of the '563 patent in January of 1983, Hirsh undertook a review of the prosecution files from the corresponding foreign cases, all of which Molins had abandoned by 1976. When Hirsh reviewed the German, Dutch, and Japanese prosecution files, he became aware of a number of prior art references, including Wagenseil, that had not been cited to the PTO during the '563 patent prosecution. Hirsh notified Smith of his discovery.[12] Because the prior art references cited in the foreign cases had not been cited to the PTO, Hirsh and Smith were concerned about the validity and enforceability of the '563 patent and sought the advice of outside counsel.

Following this consultation, on September 21, 1984, Hirsh and Smith filed a document citing a great deal of prior art under 37 C.F.R. § 1.501 [13] in the '563 patent file. The document was 11 pages in length and contained a listing of 23 U.S. patents, 27 foreign patents, and 44 U.S. and foreign printed publications. The citation was not accompanied by any comment or discussion concerning the relevancy of the patents and printed publications, nor were translations provided for most of the foreign patents and publications.

After the '563 patent was accepted for reexamination, Hirsh and Smith submitted a response to the first office action, requesting that the examiner consider and make of record all of the documents contained in the Rule 501 prior art citation. Hirsh and Smith provided English language equivalents or translations of the foreign documents and briefly commented as to the content of the cited art. They also cited the same prior art during prosecution of the '410 patent.

The court concluded that, by "burying" Wagenseil in a multitude of other references,

Hirsh and Smith intentionally withheld it from the PTO because this manner of disclosure was tantamount to a failure to disclose. Citing *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F.Supp. 948, 175 USPQ 260 (S.D.Fla.1972), *aff'd*, 479 F.2d 1328, 178 USPQ 577 (5th Cir.), *cert. denied*, 414 U.S. 874, 94 S.Ct. 66, 38 L.Ed.2d 115 (1973), the court stated that Hirsh's and Smith's failure to highlight Wagenseil in light of their knowledge of Whitson's actions in the foreign prosecutions violated their duty of candor to the PTO. Citing our precedent, Textron asserts that Smith's and Hirsh's conduct is "inexcusable, fraudulent, and cannot operate to cure Whitson's inequitable conduct." *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 220 USPQ 289 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984) (where intentional material misrepresentations have been made, a "cure" through voluntary efforts during prosecution must be demonstrated by clear, unequivocal, and convincing evidence).

Neither Molins nor Smith takes the position that the subsequent citation of Wagenseil during the reexamination proceeding or the '410 patent prosecution cured the failure to cite the reference during the original prosecution. *See id.; Precision Instrument*, 324 U.S. at 818, 65 S.Ct. at 999. Rather, it is Molins' position, which we have rejected above, that Whitson's failure to cite Wagenseil during the '563 prosecution did not amount to inequitable conduct. We therefore address, not whether the subsequent citation of Wagenseil cured the previous nondisclosure, but whether the court erred in holding that the method of disclosure by Hirsh and Smith after the '563 patent issued constituted inequitable conduct.

---

**12.** Despite Smith's and Whitson's close working relationship, the court held that Textron failed to show by clear and convincing evidence that Smith knew of or "cultivated ignorance" regarding the existence of Wagenseil before he was informed of the reference by Hirsh.

**13.** At the relevant time, 37 C.F.R. § 1.501(a) read:

§ **1.501 Citation of prior art in patent files.**
 (a) At any time during the period of enforceability of a patent, any person may cite to the

Patent and Trademark Office in writing prior art consisting of patents or printed publications which that person states to be pertinent and applicable to the patent and believes to have a bearing on the patentability of any claim of a particular patent. If the citation is made by the patent owner, the explanation of pertinency and applicability may include an explanation of how the claims differ from the prior art.

37 C.F.R. § 1.501 (1984).

In *Penn Yan*, an applicant submitted a letter to the PTO regarding a patent application about to issue, which stated: "Before the application was filed, applicant made a preliminary patentability search, and discovered the following pertinent references...." 359 F.Supp. at 964, 175 USPQ at 271. Following the statement, there appeared a list of thirteen references. The court held that inequitable conduct had occurred because the thirteenth reference listed, a patent, was not in fact discovered as a result of a preexamination search, but had issued more than one year after the filing date of the patent application at issue. *Id.* at 963–66, 175 USPQ at 271–72. The court found that the purpose of the misrepresentation was to "bury the [thirteenth reference] in a long list of allegedly old prior art patents in the hope that the Patent Examiner, having already allowed the [claims at issue], would ignore the list and permit the [patent] to issue." *Id.* at 965, 175 USPQ at 272. Thus, in *Penn Yan*, the reference was characterized in such a way as to mislead the PTO. Here, the reference was not mischaracterized, but it was submitted along with a multitude of other references.

At the time of the Rule 501 prior art submission, it was desirable practice, but not required, to particularly point out to the examiner the relevance of cited material prior art. *Compare* MPEP § 2002.03 (4th ed., rev. 2, Apr. 1980) (failure to comment on the relevance of prior art submitted or failure to identify an especially relevant passage buried in an otherwise less or nonrelevant text may constitute a failure to comply with the duty of disclosure) *with* 37 C.F.R. § 1.98 (1992) (no explanation of relevance necessary for information in the English language). Moreover, "burying" a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith. *Cf.* MPEP § 2004, Item 13 (4th ed., rev. 5, Jan. 1981) ("Don't submit long lists of prior art if it can be avoided. Eliminate clearly irrelevant and marginally pertinent cumulative prior art. If a long list is submitted, highlight those references which may be of most significance."). How-

ever, "[i]ntent to deceive should be determined in light of the realities of patent practice, and not as a matter of strict liability whatever the nature of the action before the PTO." *Northern Telecom,* 908 F.2d at 939, 15 USPQ2d at 1327.

Hirsh and Smith discovered a multitude of uncited references in related foreign files after the '563 patent issued. They disclosed the references within a relatively short time under Rule 501 and subsequently cited the references in the reexamination and '410 patent prosecution. Putting aside for now Whitson's impropriety in not citing the prior art earlier, Hirsh and Smith did make an attempt to repair the situation. The examiner initialed each reference, indicating his consideration of the same, and stated that he had considered all of the cited prior art. Absent proof to the contrary, we assume that the examiner did consider the references. *Id.,* 908 F.2d at 939, 15 USPQ2d at 1327 ("It is presumed that public officials do their assigned jobs.").[14] These circumstances therefore do not present clear and convincing evidence of intent on the part of Hirsh or Smith to conceal Wagenseil from the PTO during the reexamination. Thus, the court's finding in this regard is clearly erroneous, and the determination that the method of disclosure constituted inequitable conduct cannot be sustained.

### 3. *Whitson's and Smith's Nondisclosure of the Lemelson Patents*

During the prosecution of the claims that ultimately issued in the '563 patent, the principal references cited by the examiner against certain of the claims included patents issued in the name of Jerome Lemelson. These patents described an automatic storage system (U.S. Patent 3,049,247) and an automatic production apparatus (U.S. Patent 3,313,014 and its Reissue 26,770). The '014 patent was cited by the examiner in an office action in 1969. Subsequently, the examiner cited the '770 and '247 patents. The court determined that Whitson and Smith engaged in inequitable conduct because they knew of

14. Presumably, the examiner could have refused to consider the references if their submission did

not comport with proper PTO procedure.

the Lemelson '247, '014, and '770 patents, which were highly material, and they did not disclose those patents to the PTO. Molins and Smith assert that the court erred when it concluded that Whitson and Smith engaged in inequitable conduct in failing to cite the Lemelson patents because the patents were actually cited by the PTO and considered during the '563 patent prosecution, were used to reject pending claims, and were overcome prior to issuance of the '563 patent.

"When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner." *Scripps,* 927 F.2d at 1582, 18 USPQ2d at 1015; *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383, 217 USPQ 1281, 1286 (Fed.Cir. 1983) (nondisclosure not material because the examiner independently ascertained the existence of the undisclosed prior art). The Lemelson patents were indeed of record in the '563 patent application. We agree with Molins and Smith that the court's finding that the Lemelson patents were withheld was clearly erroneous. Thus, the failure of Hirsh and Smith to cite these references to the PTO did not constitute inequitable conduct.

### 4. *Smith's Nondisclosure of the Lemelson Application*

During the time that the '563 patent was being prosecuted, Smith was also prosecuting a machine tool application, serial number 107,357, that named Lemelson as inventor. At trial, Textron argued that Lemelson claim 11 and Williamson claim 160 defined the same patentable invention, and that Smith violated his duty of candor by not disclosing the Lemelson application to the patent examiner responsible for the Williamson application. *See* MPEP § 2001.06(b) (4th ed., rev. 8, Oct. 1981) (duty to disclose material information includes "duty to bring to the attention of the examiner ... information within [applicant's] knowledge as to other co-pending United States applications which are 'material to the examination' of the application in question."). The court found that Smith's failure to disclose the copending application of Lemelson constituted inequita-

ble conduct because the court found that claim 11 of the Lemelson application was material to the patentability of claim 160 of the '563 application, and because the court inferred an intent to deceive the PTO from the fact of Smith's dual representation of Molins and Lemelson. Smith asserts that the court erred in finding that information regarding the Lemelson application would have been material to the examiner of the '563 patent and that Smith intended to deceive the examiner by not disclosing such information.

The position in which Smith placed himself was one fraught with possible conflict of interest because Smith's dual representation of two clients seeking patents in closely related technologies created a risk of sacrificing the interest of one client for that of the other and of failing to discharge his duty of candor to the PTO with respect to each client. Whether or not there was a conflict of interest, however, is not before us, and we express no opinion thereon. Nor do we express any opinion regarding the apparent conflict between an attorney's obligations to the PTO and the attorney's obligation to clients.

However, regarding Smith's obligation to the PTO, which is before us, we agree with Smith that Textron failed to establish by clear and convincing evidence that inequitable conduct occurred in the nondisclosure of claim 11 of the Lemelson application. Lemelson claim 11 was not material to the patentability of the '563 claims because it was cumulative to art already made of record during prosecution of the '563 patent. A reference that is cumulative to other references of record does not meet the threshold of materiality needed to prove inequitable conduct. *See Scripps,* 927 F.2d at 1582, 18 USPQ2d at 1015. Claim 11 was no more pertinent to Williamson claim 160 than was claim 26 of the Lemelson '770 patent, which was already of record in the '563 patent prosecution. Thus the court's finding that the Lemelson claim 11 was material was clearly erroneous and the court's determination of inequitable conduct based on that finding was an abuse of discretion.

Textron also asserts that Smith took inconsistent positions before the PTO in the

course of his dual representation. Although Textron does not assert that this in itself amounted to inequitable conduct, Textron states that "[t]he Williamson '563 examiner would have been very interested to know that Smith had, in prosecuting the Lemelson applications, admitted that the [1954 grandparent] application disclosed the very combination which Smith had thrice argued [in the Williamson applications] was neither suggested nor disclosed by [that] application, and which Smith had argued was 'abandoned' by Lemelson." However, Smith did not in fact make that admission. In prosecuting the Williamson application, he only asserted that neither the Lemelson patents of record nor their grandparent suggested the combination of an automatic warehousing system and an automatic production apparatus. During prosecution of the Lemelson applications, on the other hand, Smith urged the patentability of claim 11, which recited a production line in which a master control device controlled transfer devices and machine tools, and argued that the Lemelson grandparent provided support for such a claim. These are different assertions.

## B. Exceptional Case

 Molins and Smith assert that the district court erred in finding this to be an exceptional case warranting an award of attorney fees under 35 U.S.C. § 285. We review the court's underlying factual findings under the clearly erroneous standard and its underlying legal conclusions de novo. *Reactive Metals & Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1583, 226 USPQ 821, 824 (Fed.Cir. 1985). If these factual and legal underpinnings withstand scrutiny, we review the award of attorney fees, *i.e.,* whether the award was appropriate and the amount reasonable, for abuse of discretion. *Id.,* 769 F.2d at 1582–83, 226 USPQ at 824. On the other hand, if the underpinnings are partially reversed, we may remand for further evaluation by the trial court.

The court partially based its finding that the case was exceptional on evidence of unfair litigation conduct on the part of Molins. Specifically, the court found that Hirsh selectively destroyed records pertaining to the

prosecution of the system 24 invention after Molins had begun contemplating litigation, precluding any potential defendant from conducting full and fair discovery. The court also found that Smith acted in bad faith in obstructing discovery and in testifying inconsistently.

 Molins states that the records that were destroyed were abandoned foreign patent files, and that any citations of references and relevant correspondence with the foreign patent offices were sent to counsel in the United States for advice concerning the failure to cite these references to the PTO. Companies are entitled to maintain file destruction programs without being found to have improperly destroyed evidence. However, the district court judge is in the best position to monitor parties' litigation conduct and can best determine whether any destruction was part of an established and legitimate records disposal program. *See Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1552, 13 USPQ2d 1301, 1305 (Fed. Cir.1989). Furthermore, the district court is "the most injured by misconduct at the pretrial and trial stages." *Rolls–Royce,* 800 F.2d at 1111, 231 USPQ at 192. The court judged the parties' conduct here, making findings adverse to Molins and Smith. Neither Molins nor Smith has convinced us of clear error in the court's findings regarding their litigation conduct. However, because the court also partly based its finding that the case was exceptional on the "pattern of repeated instances of inequitable conduct on the part of Smith, Whitson, and Hirsh," in addition to Hirsh's and Smith's litigation conduct, we remand for the court to reconsider its finding that the case is exceptional and its award of attorney fees in light of our conclusions regarding the specific types of conduct involved.

Such reconsideration should take into account the fact that we have affirmed the holding of inequitable conduct in Whitson's failure to cite Wagenseil during the original prosecution of the '563 patent, reversed the holding that Hirsh's and Smith's method of citing references post-issuance constituted inequitable conduct, reversed the holding that Whitson's and Smith's nondisclosure of the

Lemelson patents constituted inequitable conduct, reversed the holding that Smith's nondisclosure of the Lemelson application constituted inequitable conduct, and affirmed the court's findings regarding the litigation misconduct of Hirsh and Smith. Thus, the holding that Smith is jointly and severally liable cannot be based on Smith's having engaged in inequitable conduct before the PTO.

Although we have not explicitly discussed each of the arguments raised by the parties, we have carefully considered each of them. None changes the disposition of the several issues detailed herein.

## CONCLUSION

The judgment of the district court holding U.S. Patents 4,369,563 and 4,621,410 unenforceable due to inequitable conduct is affirmed on the basis that Molins' attorney Whitson intentionally withheld a material reference from the PTO. The award of attorney fees, costs, and expenses is vacated and remanded for reconsideration on the basis of the various conclusions we have reached.

## COSTS

Each party will bear its own costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, and REMANDED.*

NIES, Circuit Judge, dissenting-in-part.

I would affirm the judgment of the district court in its entirety. The appellants are guilty of a pattern of misconduct during the prosecution of the '563 patent, the subsequent reexamination of that patent, and the litigation below, during which documents were destroyed. These acts are interrelated and cannot in this case be isolated from each other.

The majority affirms inequitable conduct by Whitson, but creates a Chinese Wall between Whitson, Hirsh (Whitson's replacement), and Smith, Molins' local counsel.

Subsequent counsel carry a heavy burden to overcome known culpable acts of prior counsel. The district court found that further concealment of Whitson's actions ran afoul of Hirsh's and Smith's duty of candor. We are not at liberty to overturn the district court's finding that counsel lack credibility and acted in bad faith. Under the clearly erroneous and abuse of discretion standards applicable here, the district court's findings and conclusions regarding inequitable conduct and the exceptional nature of this case must be sustained.

### I. *Inequitable Conduct*

*Hirsh's and Smith's Failure To Disclose The Wagenseil References*

The court found that the manner in which Hirsh and Smith disclosed the Wagenseil references during reexamination of the '563 patent was tantamount to failing to disclose them at all, and that Hirsh and Smith thereby intentionally deceived the PTO.[1] The majority, however, concludes the court clearly erred in finding that Hirsh and Smith intended to deceive the PTO. In support of Hirsh and Smith, the majority notes:

> Hirsh and Smith discovered a multitude of uncited references in related foreign files after the '563 patent issued. They disclosed the references within a relatively short time under Rule 501 and subsequently cited the references in the reexamination and '410 patent prosecution. Putting aside for now Whitson's impropriety in not citing the prior art earlier, Hirsh and Smith did make an attempt to repair the situation. The examiner initialed each reference, indicating his consideration of the same, and stated that he had considered all of the cited prior art.... These circumstances therefore do not present clear and convincing evidence of intent on the part of Hirsh and Smith to conceal Wagenseil from the PTO during the reexamination.

I respectfully disagree. True, Hirsh and Smith did file a prior art list purportedly under 37 C.F.R. § 1.501, but that filing can-

1. The Duty of Candor owed by applicants to the PTO during reexamination is set forth in 37 C.F.R. § 1.555.

not realistically be characterized as a "disclosure." According to the MPEP, such a prior art list is not considered by an Examiner in the case of an already-issued patent but, rather, is simply placed in the patent's file. *See* MPEP § 2202 (5th ed., Aug. 1983)[2] ("Prior art in the form of patents or printed publications may be cited to the Patent and Trademark Office *for placement into the patent files....* The basic purpose for citing prior art in patent files is to inform the patent owner and the public in general that such patents or printed publications are in existence and should be considered when evaluating validity of the patent claims.") (Emphasis added.) There is no indication that the Examiner reviewed the list at the time Hirsh and Smith submitted it in September of 1984. The filing of the list, if anything, supports the district court's finding that Hirsh and Smith were aware of the materiality of the Wagenseil references.

I also note that Molins' prior art list, as originally submitted, did not comply with the requirements of 35 U.S.C. § 301, the statutory provision authorizing inclusion of the list as part of the patent's official file.[3] Molins' original submission did not include any explanation of any of the cited art, let alone the requisite explanation of both the pertinency and application of the cited art to particular claims. The list was 11 pages in length, and identified over 90 pieces of prior art. Aside from the bald entry of the Wagenseil references on page 4 of the list, Hirsh and Smith did nothing to bring Wagenseil to the attention of the PTO. For example, Molins could have requested reexamination when the list was filed. Molins did not, however, request the reexamination, and there were no explanatory statements accompanying the list. The undisputed fact is that Molins knew Wagenseil was more relevant than the other art—if not the most relevant prior art on the list. The court noted that "[a]s a result of reviewing the files, Hirsh saw Whitson's comments, actions, beliefs, and knowledge regarding Wagenseil."

Cross & Trecker requested, and the PTO granted, the reexamination on the basis of six IBM publications. Molins then filed a 238 page response to those references. It is true, as the majority notes, that Hirsh and Smith did subsequently cite the listed art in the reexamination. The candor of this act, however, is severely diminished by the manner of that disclosure—as noted by the district court. The citation was made as part of a massive 783–page response to an Office Action. The Examiner was literally put to finding a needle in a haystack. Furthermore, the description of the Wagenseil references provided by Molins in their response (*i.e.,* "Transfer comprising tape-controlled machine tools"), was cryptic, and Molins failed to identify any claims the patentability of which might be affected by the Wagenseil references.

After the Examiner contacted Molins regarding the inadequacy of its explanation, Molins answered with a Supplemental Response in which they reiterated the same cryptic description of Wagenseil given before. Regarding the application of the Wagenseil references to the claims, Molins' response merely stated: "This *may* be considered applicable to at least the plurality of numerically controlled machine tools recited in the claims as, for example, claim 1." (Emphasis added.) Given Molins' knowledge of the undisputed materiality of the Wagenseil references, the use of the word "may" and the reference to only one claim (out of the 294 then pending) render this statement both disingenuous and unsatisfactory. Equally disingenuous was the following statement in the Supplemental Response which prefaced the description of the cited art, including Wagenseil: "*None of the references, taken individually or in combination, is pertinent*

---

2. The Fifth Edition of the MPEP was promulgated in August of 1983. The first revisions to that edition did not occur until October of 1985.

3. Section 301 recites, in pertinent part:
 "Any person at any time may cite to the Office in writing prior art consisting of patents or printed publications which that person believes

to have a bearing on the patentability of any claim of a particular patent. *If the person explains in writing the pertinency and manner of applying such prior art to at least one claim of the patent, the citation of such prior art and the explanation thereof will become a part of the official file of the patent.*" 35 U.S.C. § 301 (1988) [Emphasis added.]

nor can it be applied to any of the claimed combinations which define the inventive subject matter as a whole." (Emphasis added.) Molins simply could not, in good faith, make such a statement, given the devastating effect the Wagenseil references had already wrought on Molins' worldwide prosecution efforts.[4]

Although the majority states that "[t]he examiner initialed each reference, indicating his consideration of the same, and stated that he had considered all of the cited prior art," this provides an insufficient basis for reversal. Upon completion of the reexamination, all of the cited references were not listed on the reexamination certificate. Indeed, Molins filed a request for a Certificate of Correction to ensure the cited prior art, including the Wagenseil references, appeared on the face of the reexamination certificate. Moreover, entry #19 on page 4 of the list (Wagenseil's "America's First Tape–Controlled Production Line" publication) has a line drawn therethrough, indicating that the reference was not considered by the Examiner. Furthermore, there are no Examiner initials indicating his consideration of that reference. Inasmuch as Hirsh and Smith never provided a separate description of that Wagenseil reference, this is not surprising.[5] Having failed to supply us with the Certificate of Correction, we do not know what art must be deemed considered.

Despite Molins' knowledge of the significance of Wagenseil, the reexamination file history, which spanned almost 1800 pages in the Appendix, clearly indicates that the focus of the communications between the PTO and Molins was the IBM art, *not* Wagenseil. For example, all of the claim rejections contained in both Office Actions are based solely on the

IBM art. The summaries of both Examiner Interviews reveal that only the IBM articles were discussed with the Examiner during the interviews. There is simply no indication that Hirsh and/or Smith did *anything* to ensure meaningful consideration of the Wagenseil references during reexamination.

*Molins' Failure To Disclose The Lemelson Patents and Application*

The district court found that Whitson and Smith withheld several Lemelson patents from the PTO during prosecution of the '563 patent application. The district court found that Whitson and Smith knew of the patents, knew the patents were highly material to the pending application, and did not disclose them with an intent to deceive the PTO. The court also found that the '357 Lemelson patent application was "highly material" to the prosecution of the '563 patent application, and that Smith's nondisclosure of the '357 application resulted from an intent to deceive the PTO. The court concluded that Whitson and Smith had, by their actions, committed inequitable conduct. The majority disagrees because the Examiner independently found and considered the patents.

To absolve Whitson and Smith for their failure to disclose the Lemelson patents, the majority relies on *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1582, 18 USPQ2d 1001, 1015 (Fed.Cir.1991), for the proposition that "[w]hen a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner." Not only is the statement relied on overly broad dicta,[6] it conflicts with an earlier decision of this court.[7]

---

**4.** The differences in U.S. and foreign law does not affect materiality of the Wagenseil disclosures.

**5.** The prior art list submitted by Hirsh and Smith identified two Wagenseil publications, listed as entry #16 and entry #19 under "Other Documents." However, both time Molins provided a description of the cited art, they provided only a description of the entry #16 publication.

**6.** Prior to making that statement, the *Scripps* court addressed and resolved the issue of inequitable conduct by concluding the withheld refer-

ence was cumulative. Thus, the court's discussion on whether or not the reference was withheld—i.e., the court's discussion of how the manner in which a reference comes before an Examiner affects an inequitable conduct analysis—was not necessary to the resolution of the issue and is, therefore, dicta.

**7.** Prior to our decision in *Scripps,* this court found inequitable conduct based on a failure to disclose art that eventually was independently discovered by the Examiner and made of record. *A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, 230 USPQ 849 (Fed.Cir.1986) (concluding non-

Respecting the Lemelson application, Smith's representation of clients with conflicting interests provides no justification for deceiving the PTO. Ethics required him to withdraw. The record amply supports the district court's finding of a pattern of conduct by appellants that reflects a concerted, ongoing effort to withhold material prior art from the PTO with an intent to deceive.

I cannot help but agree with the district court that the undisputed evidence of the series of actions by appellants, as carefully and fully articulated by the district court in two opinions totalling almost 90 pages, presents clear and convincing evidence of intent to deceive on the part of Whitson, Hirsh and Smith, even in the absence of a "smoking gun". *See Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 822, 24 USPQ2d 1121, 1127 (Fed.Cir.1992) (intent element must be proved by clear and convincing evidence). *See also Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*, 984 F.2d 1182, 1189–90, 25 USPQ2d 1561, 1567 (Fed.Cir.1993) ("[S]moking gun evidence is not required in order to establish an intent to deceive.... Rather, this element of inequitable conduct, must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct."); *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076, 22 USPQ2d 1025, 1032 (Fed.Cir.1992) ("Direct proof of wrongful intent is rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances.").

The actions of Hirsh and Smith characterized by the majority as an "attempt to repair"—the filing of the prior art list and the subsequent citation of that list in the reexamination—were, if an attempt at all, a feeble attempt, and unacceptable given their knowledge of the high materiality of the Wagenseil references. Molins was presented with ample opportunities to ensure, or at least increase the likelihood, that the Wagenseil references would be given the attention due such critical art during the reexamination.

At each such opportunity, however, Molins' actions operated to do just the opposite, almost guaranteeing that the Wagenseil references would be lost in a sea of obviously far less relevant art. Molins was simply not forthcoming with information in its possession.

The district court's findings of materiality and intent are subject to the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1562, 223 USPQ 1089, 1094 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The district court did not clearly err when it found, in light of all of the circumstances, that Whitson, Hirsh, and Smith acted with intent to deceive the PTO. The undisputed materiality of the Wagenseil and Lemelson references, when balanced with the cumulative nature of their actions evidencing an intent to deceive, compelled the district court's equitable determinations that Whitson, Hirsh, and Smith violated their duties of candor and committed inequitable conduct. In so concluding, the court did not misapply law, or abuse its discretion, and this court should therefore affirm.

## II. *Exceptional Case*

I would also affirm the court's finding that this case is exceptional and the court's discretionary award of costs, fees, interest and expenses. The findings made by the court are not clearly erroneous, *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1128, 25 USPQ2d 1913, 1921 (Fed.Cir.) (whether a case is exceptional is a factual determination, and is reviewed for clear error), *cert. denied*, —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993), and there was no abuse of discretion. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 629, 225 USPQ 634, 644 (Fed.Cir.) (awarding attorney's fees is within the discretion of the trial court), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

disclosure of known prior art references to an Examiner who, after independently discovering the references, rejected previously allowed claims which were then allowed again after amendment, constituted inequitable conduct).

Thus, prior to *Scripps*, this court concluded that a reference not disclosed to the Examiner but which is later discovered by the Examiner *can* be deemed to be withheld from the PTO, on facts similar in nature to those of the present case.

The majority unnecessarily orders a remand "because the court also partly based its finding that the case was exceptional on the 'pattern of repeated instances of inequitable conduct on the part of Smith, Whitson, and Hirsh.'" Even removing from consideration the instances of inequitable conduct reversed by the majority, there remains clear and convincing evidence that this case was exceptional. *Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1085, 5 USPQ2d 1600, 1603 (Fed.Cir.1988) ("An exceptional case must be established by clear and convincing evidence."). Indeed, as the judge noted, "this case is the exceptional case among exceptional cases."

Exceptional circumstances justifying an award of fees noted in our precedent, such as *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1242, 222 USPQ 649, 652 (Fed.Cir.1984), include unfairness, bad faith, inequitable conduct, vexatious or unjustified litigation, and misconduct during litigation. This list is not exhaustive, and the existence of any one circumstance may make a case exceptional. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 831, 23 USPQ2d 1426, 1438 (Fed.Cir.1992) ("[L]itigation misconduct may in itself make a case 'exceptional.'"); *Spectra–Physics Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1537, 3 USPQ2d 1737, 1746 (Fed. Cir.) (bad faith conduct during litigation may make a case exceptional under § 285), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). Regarding the exceptional nature of this case, the district court stated:

> The Court is persuaded that this is an exceptional case. Hirsh and Smith systematically reviewed all of Molins' files relating to the prosecution of the System 24 invention. Hirsh selected out some records, and eventually destroyed the remainder. The files were destroyed after Molins began contemplating litigation. At a minimum, Hirsh's destruction of the files is evidence of "unfairness". The destruction precluded any potential defendant from conducting full and fair discovery. When Hirsh's actions are considered in light of the other evidence of inequitable conduct on the part of Molins, the destruction of the files constitutes bad faith. It is this

evidence of unfairness and bad faith on the part of Molins that convinces the Court that this is an exceptional case.

The majority's remand is unnecessary because the unfairness, bad faith, and inequitable conduct cited by the court as the basis for its finding that this case was exceptional remain despite the majority's reversals on some instances of inequitable conduct. The unfairness was based on Hirsh's destruction of documents, which the district court noted "was the sort of bad faith litigation misconduct that would warrant an attorneys fee award." The court's finding of bad faith was based on Hirsh's destruction of documents coupled with inequitable conduct on the part of Molins. The majority's reversal does not exonerate Molins. Molins' inequitable conduct included Whitson's conduct in not disclosing Wagenseil, which the majority affirmed. Thus, there remains a basis for the court's bad faith finding. The court's finding that this case was exceptional is not clearly erroneous.

Nor is a remand necessary regarding the award of fees. The court did not abuse its discretion in making the award. The court chose three appropriate factors—closeness of the case, tactics of counsel, and the conduct of the plaintiff—from a list of factors delineated in our precedent. *See Delta–X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 25 USPQ2d 1447 (Fed.Cir.1993); *J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1051, 3 USPQ2d 1235, 1238 (Fed.Cir.1987); *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198, 201, 228 USPQ 367, 369 (Fed.Cir.1986). Of the three factors listed, it is clear that the court was most influenced by Molins' bad faith, stating "[i]n light of the scope and significance of Plaintiff's bad faith, the Court will exercise its discretion and award Defendants reasonable attorneys fees...."

In particular, the district court made numerous findings regarding Smith's conduct which were "persuasive on the issue of attorneys fees but which were not considered as relevant to the Court's conclusions" respecting inequitable conduct. In light of this statement, it seems clear that the majority's

reversals, at least regarding Smith's inequitable conduct, will have little, if any, bearing on the judge's decision to award attorneys fees on remand. Furthermore, this court has stated that "judgments of a district court concerning good and bad faith are not easily overturned." *Spectra–Physics,* 827 F.2d at 1537, 3 USPQ2d at 1746, citing *Western Marine Elecs. v. Furuno Elec. Co.,* 764 F.2d 840, 847, 226 USPQ 334, 339 (Fed.Cir.1985).

The district court went on to identify in particular Hirsh's destruction of documents and Smith's failure to identify and produce documents as further instances of bad faith. The court also noted three instances of inconsistencies in Smith's testimony during the litigation. Additionally, the district court's opinions in this case are replete with references to Smith's lack of credibility and overall veracity. The court specifically stated that Smith's testimony throughout the litigation, and particularly at trial was, at best, "less than truthful."

Hirsh's destruction of documents, which outright precluded full and fair discovery, and Smith's failure to identify and produce documents, which certainly obstructed discovery, are by themselves the kinds of actions warranting an award of attorneys fees in the interests of justice and the fair allocation of the burdens of litigation. *See Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1582, 24 USPQ2d 1401, 1420 (Fed.Cir.1992) ("The statutory purpose of [an attorney fee] award is to reach cases where the interest of justice warrants fee-shifting."); *L.A. Gear,* 988 F.2d at 1128, 25 USPQ2d at 1921 (trial judge weighs factors that may contribute to a fair allocation of litigation burdens in light of the totality of litigation circumstances). The district court awarded fees to the defendants to prevent a gross injustice, and the majority's remand is unjustified—there is abundant evidence to support the findings of the district court regarding the actions of Molins and Smith individually that remain untouched by the majority's reversals. As we have stated:

A remand, with its accompanying expenditure of additional judicial resources in a case thought to be completed, is a step not lightly taken and one that should be limited to cases in which further action must be taken by the district court in which the appellate court has no way open to it to affirm or reverse the district court's action under review.

*Consolidated Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 814, 15 USPQ2d 1481, 1488 (Fed.Cir.1990). Here, no further action should be required by the district court.

If the majority wishes to relieve Smith from liability individually, it could so hold without a remand.

PAULINE NEWMAN, Circuit Judge, concurring in the judgment, joining the court's opinion except as to part A4.

I concur in the court's judgment and join the court's opinion except as to part A4. In view of the following concerns I do not join in the court's reasoning in part A4 as to attorney Smith's obligation to disclose to the PTO the confidential information of an unrelated client.

The majority appears to assume that Smith was required to disclose information concerning Lemelson's pending application to the PTO, but for the fact that this subject matter was cumulative to prior art already before the examiner and that Smith did not really take the inconsistent positions asserted by Textron. I do not see that Smith had such an obligation. Indeed, his obligation to preserve the confidentiality of his client Lemelson was absolute. Smith had neither authority nor obligation to breach the confidentiality of that client's pending application, on behalf of a different client.

Section 2001.06(b) of the Manual of Patent Examining Procedure requires an applicant, and his or her attorney, to bring to the attention of the examiner information "as to other copending United States applications which are 'material to patentability' of the application in question." The authority cited in M.P.E.P. § 2001.06(b), *Armour & Co. v. Swift & Co.,* 466 F.2d 767, 779, 175 USPQ 70, 79 (7th Cir.1972), involved copending applications owned by the same corporation. However, § 2001.06(b) does not reach the confidential patent application that an entirely

unrelated client happened to entrust to the same lawyer. An attorney's ethical obligations to each client are not erased when a possible conflict occurs in the PTO.[1] That privilege is the client's, not the lawyer's. The PTO rules can not be interpreted to require otherwise.

I am concerned lest we appear to accept the possibility that Mr. Smith was required to disclose client Lemelson's pending application to the PTO, on behalf of client Molins. Indeed, such behavior is contrary to the PTO code of professional responsibility. Canon 4: "A practitioner should preserve the confidences and secrets of a client." 37 C.F.R. § 10.56. The disciplinary rules implementing Canon 4 require that

a practitioner shall not knowingly:

(1) Reveal a confidence or secret of a client.

(2) Use a confidence or secret of a client to the disadvantage of the client.

(3) Use a confidence or secret of a client for the advantage of the practitioner or of a third person, unless the client consents after full disclosure.

37 C.F.R. § 10.57(b). The American Bar Association Model Rules of Professional Conduct impose a similar duty:

**Confidentiality of Information**

(a) A lawyer shall not reveal information relating to the representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).[2]

A.B.A. Rule 1.6 (1983).

The facts as to Lemelson's application appear to have been before the trial court. Considering this appeal on the basis on which it reaches us, I share this court's conclusion that this subject matter was cumulative to the references of record and that inconsistent positions in prosecution were not taken. However, I stress that regulations in the M.P.E.P. can not override an attorney's obligation to preserve the confidences of the client. Thus although I share the conclusion that there was no breach of Smith's duty to the PTO, I reach that conclusion not because of the substantive differences between the Lemelson and Molins subject matter, but because Smith and Molins could not have been charged with improper behavior and the consequences thereof, simply because Smith respected Lemelson's confidences.

---

1. Whether Smith had a conflict of interest and if so how he handled it is not an issue in this case. There is no warrant for the serious ethical charge and conviction levelled by the dissent.

2. Paragraph (b) provides for unconsented revelation of information necessary to prevent the client from committing a criminal act likely to result in imminent death or substantial bodily harm, or to establish a claim or defense on behalf of the lawyer in an action arising out of the representation. It has no application here.